**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **ESTATE OF NORMAN COOPER,** | § | **IN THE DISTRICT COURT** |
| **DECEASED, NOBLE COOPER,** | § | |
| **JENNIFER COOPER,** | § | |
| **NATHAN COOPER, AND** | § | |
| **CARLY LOPEZ,** | § | |
| **INDIVIDUALLY AND** | § | |
| **AS NEXT FRIEND OF** | § | |
| **NASON COOPER AND** | § | |
| **NEVON COOPER, MINORS** | § | |
| *Plaintiffs,* | § | **5:16-CV-00077-DAE** |
| | § | |
| **VS.** | § | |
| | § | |
| **CITY OF SAN ANTONIO;** | § | |
| **OFFICER OLIVER FLAIG;** | § | |
| **OFFICER ARNOLDO SANCHEZ;** | § | |
| **ANTHONY TREVINO, INTERIM** | § | |
| **POLICE CHIEF** | § | |
| *Defendants* | | |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE DAVID A. EZRA:

Come now, Plaintiffs in this action, the ESTATE OF NORMAN COOPER, DECEASED, NOBLE COOPER, JENNIFER COOPER, NATHAN COOPER, AND CARLY LOPEZ, INDIVIDUALLY AND AS NEXT FRIEND OF NASON COOPER AND NEVON COOPER, MINORS and hereby complain of the City of San Antonio, Officer Oliver Flaig, Officer Arnoldo Sanchez, and Anthony Trevino, Police Chief, Defendants in this action and for cause would show unto the Court as follows:

# I.

## NATURE OF THE CASE

**1.** This action is brought for violations of the Plaintiff decedent's Fourth and Fourteenth Amendment rights under the United States Constitution, pursuant to 42 U.S.C. § 1983, et seq. and attorney fees and costs of court pursuant to 42 U.S.C. § 1988. Claims are also brought on behalf of the survivors and heirs of the decedent pursuant to the aforementioned remedial statutes as well as the Texas Tort Claims Act and for attorney fees and costs.

# II.

## JURISDICTION, VENUE AND PARTIES

**2.** Plaintiffs in this action are the ESTATE OF NORMAN COOPER, DECEASED, NOBLE COOPER, JENNIFER COOPER, NATHAN COOPER, AND CARLY LOPEZ, INDIVIDUALLY AND AS NEXT FRIEND OF NASON COOPER AND NEVON COOPER, MINORS. Norman Cooper was married to Carly Lopez and had two sons, Nason Cooper and Nevon Cooper at the time of his death. His wife, sons, parents, and siblings are therefore his heirs at law. All Plaintiffs reside in San Antonio, Bexar County, Texas and for purposes of this action may be served with process, except citation, summons, subpoena, or other compulsory process, care of undersigned counsel.

**3.** Plaintiff Carly Lopez is the wife of the decedent and the mother of Nason Cooper and Nevon Cooper.

**4.** Plaintiff Noble Cooper is the father of the decedent and the grandfather of Nason Cooper and Nevon Cooper.

**5.** Plaintiff Jennifer Cooper is the mother of the decedent and the grandmother of Nason Cooper and Nevon Cooper.

**6.** Plaintiff Nathan Cooper is the brother of the decedent and the uncle of Nason Cooper and Nevon Cooper.

**7.** Plaintiff Nason Cooper is the son of the decedent.

**8.** Plaintiff Nevon Cooper is the son of the decedent.

**9.** Defendant, City of San Antonio has been served with citation and has answered herein as follows:

Office of the Municipal Clerk
100 Military Plaza
City Hall, Third Floor
San Antonio, Texas 78205
Telephone: 210-207-8940

**10.** Defendant, Oliver Flaig, is sued in his individual capacity and in his capacity as an officer of the San Antonio Police Department has been served with citation and has answered herein as follows:

San Antonio Police Department Headquarters
315 South Santa Rosa Avenue
San Antonio, Texas 78207
Telephone: 210-207-7273

**11.** Defendant, Arnoldo Sanchez is is sued in his individual capacity and in his capacity as an officer with the San Antonio Police Department and has been served with citation and has answered herein as follows:

San Antonio Police Department Headquarters
315 South Santa Rosa Avenue
San Antonio, Texas 78207
Telephone: 210-207-7273

**12.** Defendant, Anthony Trevino is sued in his individual capacity and in his capacity as the Chief of Police and chief policy maker for the San Antonio Police Department at all times relevant to this lawsuit and has been served with citation and has answered herein as follows:

San Antonio Police Department Headquarters
315 South Santa Rosa Avenue
San Antonio, Texas 78207
Telephone: 210-207-7273

## III.

## FACTS GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

**13.**  Norman Cooper was a young man born on March 14, 1982 which made him 33 years old at the time of his death. Norman Cooper was married to Carly Lopez and they had two sons, Nevon Cooper and Nason Cooper. Norman Cooper was employed by Wells Fargo Bank and served as a coach for youth athletics in the "Greater Athletes Succeed" programs.

**14.**  On or about April 19, 2015, Nathan Cooper, Norman Cooper's brother, was at his parents' home. His parents, Reverend Noble Cooper and Jennifer Cooper, were out of town attending an annual religious conference that they had attended for the previous 22 years and where Jennifer Cooper was a guest speaker.

**15.**  On or about April 19, 2015, Norman Cooper arrived at his parents' home located at 4827 Legend Well Drive, San Antonio, Texas 78247 ("Cooper Residence"). Norman Cooper had been invited to come and stay at the house by Nathan Cooper and had the permission of his parents, Noble Cooper and Jennifer Cooper, to stay there at any time.   Nathan Cooper observed that Norman Cooper appeared disoriented, excited, was perspiring, and removing his clothes. Norman Cooper then began loudly citing religious quotes and ideals. Nathan Cooper knew this was not normal behavior for his brother. Therefore, Nathan began texting his parents and then called the 911 dispatcher of the San Antonio Police Department requesting assistance because he

was worried about his brother's health and well-being.

## A.   Unannounced and Unconsented Entry by SAPD Officers

**16.**   San Antonio Police Department officers, Oliver Flaig and Arnoldo Sanchez arrived at the Coopers' residence shortly thereafter. Neither officer announced their presence when they arrived at the Cooper residence. Both officers walked into the Cooper residence without the consent of Nathan Cooper who was in the home when the officers walked in.

**17.**   Officer Flaig or Sanchez asked Nathan Cooper about the situation at hand. Specifically, they asked if his brother was disoriented or whether he or Norman had been harmed in any way or if his brother was under the influence of any drugs or was in any type of physical or emotional distsress. Nathan responded that his brother was not making sense, that he appeared disoriented and that this could be the effects of drugs but that he did not know. Norman Cooper respectfully acknowledged the officers' presence and let them know he was just talking to his brother. Norman Cooper continued to loudly recite religious passages and ideals at which point one of the officers responded by yelling, "*Shut the fuck up!*" This officer then yelled at Nathan Cooper to *"get back!"* in a violent manner without any provocation whatsoever which clearly escalated the situation.

**18.**   Norman Cooper told the officers in a pleading manner, *"Officers, I'm trying to save my brother. He's been sinning."* Norman Cooper never threatened or physically contacted Nathan Cooper, or officers Oliver Flaig, or Arnoldo Sanchez.  Moreover, Norman was never rude or disrespectful to the officers. The conduct of the officers, on the other hand, appeared intended to escalate a verbal dialogue into an unprovoked and brutal attack on Norman Cooper.

## B.   Lack of Good Faith by SAPD Officers

**19.**   The officers commanded that Nathan Cooper go outside of the Cooper residence while they spoke with Norman Cooper inside the Cooper residence.

**20.**  The officers then commanded that Norman Cooper go to the upstairs portion of the Cooper residence and forbade Nathan Cooper from going upstairs. Norman Cooper complied with the officers' instructions and the officers followed Norman Cooper to the upstairs portion of the Cooper residence.

**21.**  Nathan Cooper called his father, Reverend Noble Cooper and told him that the officers had taken Norman Cooper upstairs. Nathan Cooper and Noble Cooper did not end their phone call but rather stayed connected on the phone for the duration of Norman Cooper's life Noble Cooper was therefore able to clearly hear the communications between the officers and Norman Cooper. Norman was heard by Noble, Jennifer and Nathan saying: *"Are you going to tase me"?*  They then heard several taser shots. With each taser shot Nathan Cooper and Noble Cooper could clearly hear Norman Cooper scream out in pain asking them to "please stop" and *"thank you Jesus"*; *"thank you Jesus"*; *"thank you Jesus"* which was what the Cooper family had been taught to say when confronting evil or the like.

**22.**  Additionally, at about the same time, Jennifer Cooper received a call from the landline phone at the Cooper residence from Norman Cooper. Jennifer Cooper also remained connected on the phone for the duration of Norman Cooper's life and she was also able to clearly hear the communications between the officers and Norman Cooper as well as the repeated taser shots and Norman's screams of agony and his requests for the officers to "please stop" and exhortations to "Jesus".

**C.**   **Negligent and Grossly Negligent Use of Handcuffs and Tasers**

**23.**  As previously noted, Noble Cooper heard Norman Cooper say to the officer, *"Are you going to tase me?"* Noble Cooper then heard one officer respond, *"Do you want me to tase you?"* And then the repeated tasing began by *both officers*.

**24.**  Nathan Cooper heard the scuffling of feet upstairs and then the discharge of about nine (9)

taser shots. Simultaneously, Nathan Cooper could hear his mother, Jennifer Cooper yelling, *"Stop tasing my baby"* and *"They are tasing my son to death,"* as Jennifer Cooper and Noble Cooper could hear the taser shots being fired, and hitting Norman Cooper, over their phones. The unnecessary use of excessive force including the use of taser devices in interaction with citizens has become a custom, policy, and practice amongst San Antonio Police Department officers, whether written or unwritten.  This custom has been fueled by police management that has for many years failed, or refused to discipline officers for excessive use of force or other misconduct.

**25.**   Nathan Cooper could not understand why the officers demanded that Norman Cooper go upstairs with them and then forbade him (Nathan Cooper) from going upstairs. Nathan Cooper nonetheless ran up the stairs when he heard Norman yell out in pain, *"Ahh!"* and *"Jesus!"* Nathan Cooper heard an additional two (2) taser shots fired as he ran up the stairs.

**26.**   Simultaneously, Jennifer Cooper heard Norman Cooper scream, *"Thank you Jesus, Thank you Jesus, Thank you Jesus!"* Norman Cooper and the entire Cooper family customarily say, *"Thank you Jesus,"* when they are calling on Jesus for help or to call on Jesus to free them from the hand of the devil.

**D.**   **Bad Faith By SAPD Officers**

**27.**   When Nathan Cooper reached the upstairs portion of the Cooper residence he observed Norman Cooper on the floor face down with two officers on top of him. Norman Cooper was handcuff-cuffed with his hands behind his back and not resisting in any way. The officers had deliberately and unnecessarily "tased" [1] Norman Cooper repeatedly causing extreme electrical

---

[1] Taser is a "conducted electrical weapon" and is an acronym for Thomas A. Swift Electrical Rifle. (The SAPD refers to these types of weapons as Electrical Conducted Devices or "ECDs").

distress. The position Norman Cooper was placed in, face down on the floor with his hands cuffed behind his back and the officers' body weight applied to his back and neck was clearly unnecessary and excessive. These actions increased the stress on Norman Cooper's heart and caused his death.

28.   The officers knew or should have known that both of them tasing Norman Cooper multiple times was dangerous and lethal. [2] Moreover, the officers had a duty not to tase Norman Cooper simultaneously multiple times. They breached this duty to Norman Cooper and thereby killed him. Norman Cooper's death was wholly unprovoked, unnecessary and unjustifiable. Accordingly, Mr. Cooper is entitled to damages for these breaches of duty.

29.   Nathan Cooper informed the officers that his mother, Jennifer Cooper, was on the landline phone at the Cooper residence and heard her son's agonizing final moments before the officers grabbed the landline phone and disconnected the call.

30.   Nathan Cooper further informed the officers that his father, Noble Cooper, was on his cell phone and wanted to speak with the officers. The officers responded by telling Nathan Cooper that they would talk to him once more officers arrived.

31.   Nathan Cooper remained in the upstairs portion of the Cooper residence in the same room where his brother, Norman Cooper, was handcuffed face down on the floor. It was plain to see that Norman Cooper was in extremis. Flaig and Sanchez made absolutely no effort to check on Norman Cooper's health or well-being.

**E.   Deliberate Indifference to Serious Medical Needs**

32.   Approximately fifteen (15) minutes later several other San Antonio Police Department

---

[2] The United Nations Committee Against Torture concluded that the use of the TaserX26 weapon causes severe pain constituting a form of torture and in some cases the Taser X26 weapon causes death. *See* UN Committee Against Torture (CAT), *Conclusions and recommendations of the Committee against Torture: Portugal*, 19 February 2008, CAT/C/PRT/CO/4, available at: http://www.refworld.org/docid/4804a62e2.html [accessed 6 September 2016].

officers arrived as Norman Cooper remained face down on the floor, motionless.

**33.**   At no point during this time did any of the officers check on the health or well-being of Norman Cooper who remained silent and motionless. The officers made no effort to monitor his breathing or turn him on his side or administer cardiopulmonary resuscitation (CPR). Accordingly, the Defendant officers were deliberately indifferent or consciously indifferent to Norman Cooper's serious medical needs.

**34.**   Less than a minute later Nathan Cooper observed Norman Cooper gasping for air to breathe and then he clearly stopped breathing.  Again, the officers saw this but made no effort monitor his breathing or turn him on his side or to administer CPR or undertake any other life-saving measures.

**35.**   Eventually, a female San Antonio Police officer entered the room where Norman Cooper was handcuffed face down on the floor and motionless and grabbed her flashlight and flashed it into Norman Cooper's eyes and said in a jovial, mocking manner, *"Oh yeah, he'll be fine."* A male San Antonio Police officer responded laughing, *"Oh, so you're a doctor now?"* Several of the San Antonio Police officers present began laughing.

**36.**   Approximately, twenty-five (25) minutes later multiple San Antonio Police officers and, Emergency Medical Services (EMS) finally arrived at the Cooper residence. EMS attempted to revive Norman Cooper through emergency resuscitation procedures but their efforts were futile because Norman Cooper had already died.

**37.**   The Defendant officers' actions and failures to act when they had a duty to act were conscious, deliberate decisions not to render aid to Norman Cooper even though it was clearly a matter of life or death. This was an oppressive, unconstitutional use of excessive physical force without due process of law. Therefore any claim that their actions, or that any officer's actions, were undertaken in good faith and that they are therefore entitled to, or should be entitled to

qualified immunity should be denied.

**F.   SAPD Officers Exceeded the Course and Scope of Their Employment**

**38.** At all times material herein, the Defendants who were in any way connected with the occurrence were acting within the course and scope of their employment or official duties and in furtherance of the duties of their office or employment. The acts described above however exceeded the course and scope of their employment or official duties when the force used against the decedent became excessive, dangerous and lethal. Moreover, the officers' failure or refusal monitor his breathing or turn him on his side or to administer CPR constitutes a clear failure to prevent a violation of Norman Cooper's constitutional right to life.

**39.** The Defendant officers were deliberately indifferent to Norman Cooper's serious medical needs caused by the use of the tasers and handcuffs and Norman Cooper died unnecessarily as a result of their actions and their failures to act when they had a duty to act. These actions and inactions by the defendant officers exceeded the course and scope of their employment because rendering aid to a dieing person is non-discretionary - it is an act that peace officers must undertake. Moreover, it is a non-relegable duty. The defendant officers here utterly failed in their sworn duties.

**IV.**

**STATUTORY NOTICE**

**40.**    The above and foregoing paragraphs as well as the following paragraphs are hereby incorporated by reference to the extent they are relevant and not irreconcilable.

**41.**    Prior to the filing of this lawsuit, and within 180 days from the date of the occurrence described in this petition, Carly Lopez, (Noble Cooper, Jennifer Cooper, and Nathan Cooper), individually and in her representative capacity presented her timely notice of claims to the City of San Antonio as prescribed by the Texas Tort Claims Act. Moreover, the Defendants were on

actual notice as a result of the Coopers' complaint to the Internal Affairs unit of the San Antonio Police Department as well as the Custodial Death Report that was prepared by the San Antonio Police Department and submitted to the Texas Attorney General's office.

## V.

### CAUSES OF ACTION UNDER THE TEXAS TORT CLAIMS ACT

**42.**  The occurrence described in the petition is a direct and proximate cause of the negligent, grossly negligent, reckless and/or wanton conduct of the City of San Antonio in the following particulars:

**a)**  The handcuffs and taser devices were instrumentalities of the City of San Antonio. The use of the handcuffs was negligent as follows:

**b)**  The officers responding to the scene knew or should have known that a disoriented man, believed to be under the influence of drugs, and suffering from excited delirium and/or a mental illness at his childhood home should not be arrested, tased multiple times, and handcuffed with his hands behind his back and placed in a prone position (face down on his stomach) and then have weight and physical pressure brought to bear upon his back.

**c)**  The officers were trained or should have been trained in the dangers of positional asphyxiation and cardiac arrest when they arrest and place someone in handcuffs with their hands cuffed behind their back then placed face down in a prone position with weight and force on their back.

**d)**  Further, the officers were trained or should have been trained in the increased dangers of shocking a person with a Taser as well as positional asphyxiation and cardiac arrest when they arrest someone suffering from excited delirium and/or a mental illness and place this person in handcuffs with their hands cuffed behind their back then placed face down in a prone position with weight and force on their back contrary to the officers' Department's protocol of de-escalation and the proper procedures for working with a citizen suffering from excited delirium and/or a mental illness.

**e)**  Additionally, the Defendant officers knew or should have known that Norman Cooper should be not be tased by each officer multiple times.

**f)**  Moreover, the Defendant officers knew or should have known that Norman Cooper should be not be tased at all in accordance with their Department's policy because the Defendant officers believed Norman Cooper was under the influence of drugs.

## VI.

## CAUSE OF ACTION AGAINST DEFENDANT CITY UNDER
## V.T.C.A. CIV. PRAC. & REM. CODE ANN., '101.001, ET.SEQ.

**43.** All of the above and foregoing paragraphs, as well as following allegations are hereby incorporated by reference, as if fully set out for all intents and purposes to the extent that they are relevant and not irreconcilable.

**44.** At all times material hereto, the Defendants were acting as an agent, servant and/or employee of the Defendant City of San Antonio.

**45.** The Defendants, at all times material hereto, were performing a governmental function and acting within the scope of eaches employment during the occasion in question as hereinabove set out.

**46.** The Defendants, through the misuse of tangible personal property, i.e. the negligent use of taser devices and handcuffs took the life of the decedent, without due process of law. The conduct of the City of San Antonio through its officers rises to the level of gross negligence.

**47.** The Defendant City of San Antonio is responsible for the actions of its officers under V.T.C.A. Tex. Civ. Prac. & Rem. Code, §101.0215. The taser devices and handcuffs that were used by the officers that killed Norman Cooper engaged in the type of misuse of tangible personal property that the Texas Tort Claims Act was intended to address and remedy.

## VII.

## ESTATE OF NORMAN COOPER, DECEASED

**48.** All of the above and foregoing paragraphs, as well as following allegations are hereby incorporated by reference, as if fully set out for all intents and purposes to the extent that they are relevant and not irreconcilable.

**49.** As the direct and proximate result of the negligence, gross negligence, recklessness and/or

wantonness of the defendants, the decedent was caused the pain and suffering to the body of Norman Cooper. The Defendants' use of the taser devices and handcuffs in a negligent manner as described above likewise caused the decedent the pain and anguish of being electrically shocked and suffocated and hereby sues for these personal injuries by and through the ESTATE OF NORMAN COOPER, DECEASED. Plaintiff decedent sues for damages in the following particulars:

      **a.** Pain and suffering;

      **b.** lost income in the future;

      **c.** loss of economic earning potential;

      **d.** loss of the enjoyment of life;

      **e.** loss of the companionship of his wife, sons and family;

      **f.** compulsatory, non-compulsatory and punitive damages are sought against the officers, individually to the extent they are permitted by law; and,

      **g.** funeral expenses;

**50.** Plaintiff has been damaged in all of these respects far in excess of the jurisdictional requirements of the Court.

## VIII.

## <u>CARLY LOPEZ</u>

**51.** All of the above and foregoing paragraphs, as well as following allegations are hereby incorporated by reference, as if fully set out for all intents and purposes to the extent that they are relevant and not irreconcilable.

**52.** As the direct and proximate result of the negligence, gross negligence, recklessness and/or wantonness of the defendants, the Plaintiff, Carly Lopez, suffered and will continue to suffer for the remainder of her natural life:

**a.** Past pain and suffering in the past and in the future;

**b.** loss of economic support;

**c.** loss of future economic support;

**d.** loss of emotional support;

**e.** loss of inheritance;

**f.** loss of companionship;

**g.** loss of the love and companionship of her husband;

**h.** grief and bereavement;

**i.** funeral expenses for the decedent; and,

**j.** compulsatory, non-compulsatory and punitive damages are sought against the individual officers to the extent they are permitted by law.

53.   Plaintiff Carly Lopez has been damaged in all of these respects far in excess of the jurisdictional requirements of the Court.

## IX.

## <u>NEVON COOPER AND NASON COOPER</u>

54.   As the direct and proximate result of the negligence, gross negligence, recklessness and/or wantonness of the defendants, Plaintiffs Nevon Cooper and Nason Cooper, the decedent's sons, suffered and will continue to suffer for the remainder of their natural lives:

**a.** The loss of social comfort of their father;

**b.** pain and suffering in the past and in the future;

**c.** loss of economic support in the past and the future;

**d.** grief and bereavement;

**e.** funeral expenses for the decedent; and,

**f.** compulsatory, non-compulsatory and punitive damages are sought to the extent permitted by law.

**55.** Plaintiffs, Nevon Cooper and Nason Cooper have been damaged in all of these respects far in excess of the jurisdictional requirements of the Court.

**X.**

**<u>NOBLE COOPER, JENNIFER COOPER AND NATHAN COOPER</u>**

**56.** All of the above and foregoing paragraphs, as well as following allegations are hereby incorporated by reference, as if fully set out for all intents and purposes to the extent that they are relevant and not irreconcilable.

**57.** As the direct and proximate result of the negligence, gross negligence, recklessness and/or wantonness of the defendants, Plaintiffs, Noble Cooper and Jennifer Cooper, the decedent's parents, suffered and will continue to suffer for the remainder of their natural lives:

> **a.** The loss of social comfort of their son;
>
> **b.** pain and suffering in the past and in the future;
>
> **c.** loss of economic support;
>
> **d.** grief and bereavement;
>
> **e.** funeral expenses for the decedent; and,
>
> **f.** compulsatory, non-compulsatory and punitive damages against the officers, individually are sought to the extent permitted by law.

**58.** Plaintiffs, Noble Cooper and Jennifer Cooper have been damaged in all of these respects far in excess of the jurisdictional requirements of the Court.

**59.** As the direct and proximate result of the negligence, gross negligence, recklessness and/or wantonness of the defendants, Plaintiff, Nathan Cooper, the decedent's brother, was forced to be a bystander as his brother was killed by police in their home. As a result, Nathan Cooper suffered and will continue to suffer for the remainder of their natural life:

> **a.** The loss of social comfort of his older brother;

     **b.** pain and suffering in the past and future;

     **c.** loss of economic support;

     **d.** grief and bereavement;

     **e.** funeral expenses for the decedent; and

     **f.** compulsatory, non-compulsatory and punitive damages against the officers, individually are sought to the extent permitted by law.

**60.** Plaintiff, Nathan Cooper has been damaged in all of these respects far in excess of the jurisdictional requirements of the Court.

## XI.

## CONSTITUTIONAL CLAIMS

**61.** All of the above and foregoing paragraphs, as well as following allegations are hereby incorporated by reference, as if fully set out for all intents and purposes to the extent that they are relevant and not irreconcilable.

**62.** At all times material hereto, Defendants had a duty to protect the bodily integrity of the decedent and secure his constitutional rights to be free from the excessive use of force. The officers were clearly aware of Norman Cooper's right to be free of unreasonable seizures under the Fourth Amendment of the United States Constitution and nevertheless violated this right when they each tased him multiple times. These electrical discharges in combination with his hands being handcuffed behind his back and placing him face down on the ground in a prone position with weight on his back restricting his ability to breath was exceedingly dangerous and lethal and contrary to the officers' training and their Department's protocol of de-escalation and the proper procedures for working with a citizen suffering from excited delirium and/or a mental illness.

Additionally, the Defendants knew Norman Cooper was under the influence of drugs yet intentionally disregarded their Department's policy **prohibiting** the use of a Taser against a citizen under the influence of drugs. Further, it is undisputed that Norman Cooper was unarmed and did not attempt to flee as he remained in his parent's house and childhood room until his death. Moreover, based upon knowledge and belief, the Defendants asserted that they did *not even know* if any crime had been committed.

### A.   Decedent's Fourth Amendment Rights Were Clearly Established and Violated

**63.** A law enforcement officer is not shielded from liability under an excessive force claim if (1) an officer's conduct violated a constitutional right, and (2) the officer's actions were objectively unreasonable in light of clearly established law at the time of the incident. *See Poole v. City of Shreveport,* 691 F.3d 624, 627 (5th Cir. 2012)*; Brumfield v. Hollins,* 551 F.3d 322, 326 (5th Cir. 2008). It is clearly established the Fourth Amendment confers a right "to be free from excessive force during a seizure." *Poole*, 691 F.3d at 627.

**64.** "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The central concept" of this analysis is "fair warning," which means that a reasonable official would understand the conduct violated the Fourth Amendment. *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012). Further, there need not be binding case law directly on point as even the *Graham* (Graham v. Connor, 490 U.S. 386 (1989)) factors, themselves, can place an officer on notice that conduct violates clearly established law. *Id.* at 764 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

**65.** Lawfulness of force, however, does not depend on the precise instrument used to apply it. *See Spann v. Rainey*, 987 F.2d 1110, 1115-16 (5th Cir. 1993) (use of flashlight, hands, and nightstick); *Peterson v. City of Fort Worth*, Tex., 588 F.3d 838, 846 (5th Cir. 2009) (hard knee-strike).

Qualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel. *Newman*, 703 F.3d at 763-64. Officers are only permitted to use "measured and ascending" responses to resistance by a suspect, which often requires using "physical skill, negotiation, or even commands" before resorting to the "taser and nightstick." *Id.* at 763.

66.   Accordingly, an officer's use of a Taser on a citizen itself does not necessitate the officer's enjoyment of qualified immunity. *See Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (denying qualified immunity where officer used Taser on non-threatening suspect, even where suspect had pulled away from officer's attempt to handcuff him); *Newman*, 703 F.3d 757 at 762-63 (5th Cir. 2012) (denying qualified immunity where officers immediately resorted to using nightstick and taser where suspect did not pose threat to officers' safety and did not resist officers or attempt to flee); *Anderson v. McCaleb*, 480 Fed. Appx. 768, 773 (5th Cir. 2012) (per curiam) (holding that officer "should have known that he could not continue to shock [plaintiff] with the taser after he was no longer resisting arrest."). In fact, the Fifth Circuit has held that the law on the use of tasers was clearly established long before the events at issue here. *See Newman*, 703 F.3d at 763-64; *Ramirez,* 716 F.3d 369 at 379.

67.   The Defendants failed to act as reasonable persons would have acted in the same or similar circumstances in that they unnecessarily escalated their force by each of them tasing him multiple times and restraining him with his hands cuffed behind his back and then placing him in a prone position inhibiting his ability to breathe as described above and causing him to go into cardiac arrest rather than utilizing established protocols for using a continuum of force and de-escalation. The stated continuum of force policy begins with verbal persuasion followed by verbal commands, physical manipulation or other non-deadly alternatives. The excessive force was administered even though it had not been provoked by Norman Cooper, who was at all times unarmed, compliant and

posed no threat to the defendant police officers.

**68.**   In addition, the Defendants' actions on the occasion in question deprived the deceased Plaintiff, and the decedent's family, of their right to the continued companionship and association with their husband, father, son, and brother without due process of law.

**XII.**

**FOURTEENTH AMENDMENT CLAIMS**

**A.**   **Flawed and Inadequate Training**

**69.**   All of the above and foregoing paragraphs, as well as following allegations are hereby incorporated by reference, as if fully set out for all intents and purposes to the extent that they are relevant and not irreconcilable.

**70.**   At all times material hereto, the Defendants had guidelines on the use of force, including but not limited to deadly force, in situations akin to the one at bar. The San Antonio Police Department's policies and procedures call for a continuum of force and de-escalation to be used by San Antonio Police. The City's policy is flawed in that it authorizes officers to use taser devices, handcuffs, and other positional restraints in combination with weight and force on decedent's back while being held in a prone position, face down, on the ground. These guidelines were grossly inadequate and lead to the Defendants' unrestrained use of excessive force against the unarmed decedent and thereby causing his death.

**71.**   The lack of proper or adequate training on the use of electrical conducting devices (EDC) or taser devices on the same person and discharging each device multiple times. The use of handcuffs in the manner used with positional restraints and pressure is condusive to positional asphyxiation and is unconstitutional. The Defendant officers failed or refused to recognize the signs of a detainee suffering an inability to breathe because of the handcuffs, as well as the electrical discharges, and their weight, or force applied to decedent's back while in a prone position.

Additionally, the officers were improperly trained on and failed or refused to recognize a citizen excited delirium or other drug induced or mental disorders.

**B.   Failure to Properly Supervise, Regulate and Discipline for Excessive Force**

**72.**   The Defendant City's failure to properly train, supervise, regulate, and/or discipline officers who routinely use excessive force in making arrests including Defendants (who have not, to date, been disciplined in any way for the acts complained of herein), or to otherwise control their employees and the failure to promulgate proper guidelines for the use of force and deadly force constitutes an official policy, practice or custom of condoning unjustified use of deadly force in violation of the constitutional rights of the decedent and others and serves to condone the illegal behavior as alleged. Each of the actions and inactions by the City of San Antonio through its officers Flaig, Sanchez and Trevino constitute an unconstitutional policy or custom which violated Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs therefore bring suit pursuant to Title 42 U.S.C. § 1983, et seq.

**73.**   The Due Process Clause of the Fourteenth Amendment protects an arrestee's right not to have his serious medical needs met with deliberate indifference on the part of arresting officers. *See Hill v. Carroll County, Mississippi*, 587 F.3d 230, 237 (5th Cir. 2009) (citing *Nerren v. Livingston Police Department*, 86 F.3d 469, 473 (5th Cir. 1996) ("After the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pre-trial detainee, derives from the Fourteenth Amendment.")). *See also City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244-45 (1983) ("The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons, such as [Norman Cooper], who have been injured while being apprehended by the police."). "Deliberate indifference, as defined in due process cases, requires both that the government official have 'subjective knowledge of substantial risk of serious

harm to a pretrial detainee' and that the government official respond with 'deliberate indifference to that risk.'" *United States v. Gonzales*, 436 F.3d 560, 573 (5th Cir. 2006) (quoting *Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc)). A government official's knowledge of a substantial risk of harm may be inferred if the risk was obvious. *Gonzales*, 436 F.3d at 573 (citing *Farmer v. Brennan*, 511 U.S. 825, 840-41 (1994))

**74.**   Specifically, Plaintiffs sue for damages for the Defendants' violation of Plaintiffs' Fourth Amendment (right to be free from unreasonable seizure by police) and Fourteenth Amendment right (to equal protection under the law and due process by law) under the United States Constitution. Furthermore, Plaintiffs allege that the wrongful and intentional or grossly negligent acts of the Defendants as alleged in the foregoing paragraphs entitle them, as legal heirs of the deceased's estate, to recover for the physical pain and mental suffering of the deceased, for the loss of the decedent's civil rights, and for the emergency medical service and funeral expenses and other expenses directly and proximately resulting from the defendants' violations as hereinbefore alleged.

**75.**   The Defendant City of San Antonio through its management officers have created a custom of failing to discipline officers in response to complaints of excessive force by citizens. In fact, the City of San Antonio, upon information and belief disciplines its officers for their unnecessary use of force or excessive use of force in well under one percent (1%) of all cases. [3] This failure or refusal to take action to correct the use of excessive force has caused officers to believe that the use of excessive force is an acceptable practice, and has in fact become an informal, unwritten policy or custom of the San Antonio Police Department. There are literally countless examples of

---

[3]   "Two sergeants reviewed the incident and checked off a box in the use-of-force reports stating the officers violated no policies. That stamp of approval happens often — less than 1 percent of more than 5,300 force incidents in the past five years were flagged for violating SAPD policy." San Antonio Express-News (May 28, 2016) "Analysis: SAPD Officers Use Force at Higher Rates Against Minorities"

this pattern and practice of behavior; however, the following are merely some examples of recent cases where the San Antonio Police Department took no meaningful disciplinary action, if any, against the identified police officers after the gross and injurious misconduct they committed:

**A.  *David Brian Ricks vs. City of San Antonio; San Antonio Police Department; Misty Floyd, Individually; Jacob Garcia, Individually; and Efren Alaniz, Individually,* <u>Case No. SA-15-CV-00251-FB</u>:**

    (1)    On or about April 6, 2013, David Brian Ricks called San Antonio Police Department (SAPD) 911 dispatch to report that his daughter was missing from his home. Officer Misty Floyd arrived at Mr. Ricks' residence and Mr. Ricks showed her where his daughter had cut a screen to her bedroom and climbed out. Officer Floyd detected an aroma of alcohol coming from Mr. Ricks' person and commanded him to go inside his residence which Mr. Ricks refused. Officer Floyd then physically took Mr. Ricks to his front door and threatened that if he did not go inside he would be arrested.

    (2)    When Mr. Ricks called his wife Officer Floyd placed Mr. Ricks under arrest and placed him in handcuffs in a manner that caused Mr. Ricks to lose his balance. Officer Floyd threw Mr. Ricks to the ground and then started hitting Mr. Ricks' face with her fist multiple times and then deployed her **taser** which struck Mr. Ricks in the back and then began to pummel him again.

    (3)    SAPD Officers Garcia and Alaniz arrived and Officer Garcia placed his knees on Mr. Ricks' back and pushed his face into the ground. The defendant SAPD officers then started to kick and stomp Mr. Ricks multiple times without any reasonable law enforcement need to do so before they finally transported him to the police station. Mr. Ricks should have clearly been transported to University Hospital by Emergency Medical Services (EMS) personnel.

    (4)    As a result of this horrific attack Mr. Ricks suffered fractures to his shoulder, ribs, sternum and ankle, a collapsed lung and multiple head injuries causing him to spend two weeks in the hospital including two days in the intensive care unit. Although Mr. Ricks was frivolously charged with Assault of a Public Servant as a result of this incident these charges were dismissed by the Bexar County District Attorney's office on or about April 14, 2015 based on *insufficient evidence.*

**B.  *Shavonda Bailey, as Next Friend of K.A., and P.A.; Vivian Lampkins, as Next Friend of J.L.; Belinda Carranco, as Next Friend of Z.A.; Brandie Oliver, as Next Friend of A.O.; and Christine Ownes, as Next Friend of M.O. vs. City of San Antonio, Texas; Nathan Preston, Individually; Vidal Diaz, Individually; Michael Fletcher, Individually; Francisco Galvan, Individually; Matthew Flores, Individually; Aubrey Plauche, Individually; Matthew Quintanilla, Individually; Robert Tamez, Individually; and Paul Trigo,***

*Individually,* **Case No. 5:13-cv-700-FB**:

    (1)    On or about August 4, 2011, Pierre Abernathy, a paranoid schizophrenic, was picking up his fiance from work and encountered San Antonio Police Department (SAPD) officers who started to follow him. Based on previous encounters with SAPD officers, Mr. Abernathy pulled into his mother's driveway and exited his vehicle.

    (2)    Multiple defendant SAPD officers chased him around his mother's and her neighbors' front yards and began **tasing** him. The defendant SAPD officers then placed Mr. Abernathy in handcuffs behind his back and then released their canine (K-9) unit who mauled Mr. Abernathy as the officers watched.

    (3)    The defendant SAPD officers then proceeded to savagely beat Mr. Abernathy to **death** while he was on the ground in a defenseless fetal position. The defendant SAPD officers encouraged each other by saying "yeah get some, yeah get some" while Mr. Abernathy lay motionless.

    (4)    At no point did Mr. Abernathy become violent or resist any of the officers' requests and this was witnessed by Mr. Abernathy's mother, family members, and neighbors. A neighbor who was a nurse offered to provide medical attention but the defendant SAPD officers told her to stay away or she would be arrested.

**C.**   *Rogelio Carlos, III and Myrna Carlos v. Carlos Chavez, Virgilio Gonzalez, James Ybarra, Mark Delgado, City of San Antonio, San Antonio Police Department, and Detective John Doe,* **Case No. 5:16-CV-251**:

    (1)    On or about May 20, 2014, Rogelio Carlos was at his and his wife's property located at Westover Hills and Rodgers Road when all of the sudden, without warning, Detective John Doe and Officers Carlos Chavez and Virgilio Gonzalez began **punching** Mr. Carlos with their fists and kicking him around the head and his body while one officer pressed his knee on Mr. Carlos' neck. Mr. Carlos begged the officers to stop but the officers continued to strike Mr. Carlos around the face, neck, and body yelling "where's the gun?" Mr. Carlos replied "I don't have a gun, this is my property, this is my property." The officers placed Mr. Carlos in handcuffs.

    (2)    At no time did the officers ask Mr. Carlos to identify himself. At no time did the officers ask Mr. Carlos to identify himself through a photo identification, cell phone or otherwise.

(3)     After Mr. Carlos was placed in handcuffs he lay face down in the dirt. After Mr. Carlos was so violently assaulted the officers *realized* Mr. Carlos had in fact committed **no crime** nor was there any reason to detain him.   The officers and detective, John Doe were actually searching for an alleged perpetrator who fled on foot near Mr. Carlos' property. After the brutal beating by the detective and officers and detaining of Mr. Carlos, the detective and officers realized they had made a mistaken identity.

(4)     As a result of Mr. Carlos' injuries after the **brutal beating** unprovoked and unjustifiable brutal beating, he required **surgery** to relieve the pain in his neck. The surgery resulted in paralysis from his neck down.

**D.   *Cheryl Jones, Individually and as Natural Mother to Marquise Jones and as Representative of the Estate of Marquise Jones, Deceased, Blake Lamkin, Individually and as Natural Father to Marquise Jones, Whitney Jones, Individually, and K.J., a Minor, By and Through Her Mother and Guardian, Melkay L. Nation vs. The City of San Antonio, Texas, Robert Encina, John Burke, Quinonez Foodservice, Inc. and Chacho's 8614 Perrin Beitel, Ltd.*, Case No. 5:14-CV-328:**

(1)     On or about February 28, 2014, Marquise Jones was a passenger in a vehicle that was in a drive through lane a Chacho's & Chalucci's. The driver of the vehicle slightly bumped into the vehicle ahead of them. The drivers of both vehicles got out of their vehicles to check for any damage but there was none so both drivers returned to their vehicles without incident.

(2)     Officer Robert Encina appeared out of nowhere, without warning and demanded that the driver of the vehicle wherein Mr. Jones was a passenger get out of the vehicle. Officer Encina used extreme and unnecessary force in searching and handcuffing the driver.

(3)     Based on Officer Encina's conduct with the driver, Mr. Jones became fearful for his safety and decided to leave to avoid being attacked. Mr. Jones exited the vehicle and began to walk away and when Officer Encina noticed this he pulled out his gun and **shot** Mr. Jones **in the back** resulting in his **death**.

**E.   *Destiny Annemarie Rios vs. City of San Antonio, Texas; Officer Travis Reich, Individually; Officer Delgado, Individually; Officer Valenzuela, Individually; William McManus, Individually*, Case No. 5:14-CV-590:**

(1)     On or about July 4, 2012, Destiny Rios was walking home to her residence when she was approached by San Antonio Police Department (SAPD) officer Travis Reich who informed her he was authorized to stop anyone found in the West Side neighborhood even though Officer Reich did not

observe Ms. Rios commit a crime. Ms. Rios still remained cooperative and provided Officer Reich with her identification and social security number. Officer Reich then accused Ms. Rios of using heroin and commanded her to let him look through her purse. Ms. Rios amazingly still remained cooperative and let Officer Reich search her purse which resulted in **no** illegal drugs or weapons being found. Officer Reich told Ms. Rios she was free to leave and returned to his patrol car.

(2)     Shortly thereafter, Officer Reich returned and arrested Ms. Rios after learning she had an outstanding warrant for alleged prostitution.

(3)     Ms. Rios was walking away at this point when Officer Reich forcibly grabbed and twisted her arms and handcuffed both hands behind her back. Officer Reich then violently threw Ms. Rios face down to the ground and got on top of her with his hands gripping the back of her neck and his knees planted on her back in the middle of her shoulders forcing her face and body down into the asphalt surface.

(4)     Soon after San Antonio Police Department officers Delgado and Valenzuela arrived and all defendant SAPD officers **savagely beat Ms. Rios while she lay face down on the ground in handcuffs** with an officer's boot planted in the middle of her shoulder blades.

(5)     As a result Ms. Rios suffered multiple serious injuries including intense bleeding from her uterus and discharge of tissue resulting in a **miscarriage**. The defendant SAPD officers refused to allow an ambulance to transport her to the hospital for medical attention.

**F.   *Thomas Mathieu vs. City of San Antonio, Texas; Juan Campacos, Individually; and Patrick Thomas, Individually,* Case No. 5:15-cv-474:**

(1)     On or about January 13, 2014, Thomas Mathieu, a diabetic who is 70 years of age, had just left the hospital where his wife had undergone surgery. Mr. Mathieu began to feel ill and decided to pull over on the side of the road and put his car in park and lost consciousness.

(2)     San Antonio Police Department (SAPD) officers Campacos and Thomas then arrived at Mr. Mathieu's vehicle and opened the unlocked door and commanded that Mr. Mathieu get out of his vehicle.

(3)     Mr. Mathieu was just awakening from his diabetic episode and was unable to immediately comply to the officers' satisfaction. Therefore, the defendant SAPD officers attempted to forcefully pull Mr. Mathieu out of the vehicle and being fearful upon awakening to these actions by the officers Mr. Mathieu pulled away.

(4)     The defendant SAPD officers then started **punching** Mr. Mathieu in the face repeatedly until Mr. Mathieu was finally removed from the vehicle.

The defendant SAPD officers threw Mr. Mathieu face down on the ground and handcuffed him with his hands behind his back. The defendant SAPD officers then started to inquire as to how much alcohol Mr. Mathieu had to drink and Mr. Mathieu repeatedly told them he had not drank any alcohol.

(5)   When the defendant SAPD officers located Mr. Mathieu's driver's license in his car they asked him if he was diabetic to which he said yes. Therefore, the defendant SAPD officers finally called Emergency Medical Services (EMS) to come to the scene to provide medical attention to Mr. Mathieu and were informed by EMS personnel that Mr. Mathieu was suffering from a **diabetic episode** due to low blood sugar. As a result, Mr. Mathieu suffered multiple serious injuries.

## XIII.

## RESPONDEAT SUPERIOR AND SUPERVISOR LIABILITY BASED ON SPECIFIC ACTIONS AND INACTIONS WHEN THERE WAS A DUTY TO ACT

**76.**    Upon information, knowledge and belief none of the officers in the above referenced examples were disciplined in any meaningful way.  Inaction by supervisors, managers and policy makers when they have a duty to act reinforces the use of excessive force by officers.

**77.**    Further, at all times material hereto, Defendants were acting as agents, servants and employees of Defendant City of San Antonio and were acting within the scope of their employment.

**78.**    Defendant City of San Antonio, as principal, master and employer of Defendants is liable for Defendants' torts and constitutional violations under respondeat superior.

**79.**    Hence, the Defendant City of San Antonio and its officers are also responsible for violating the decedent's right to life and to be free from deprivation of this right from the state, without due process of law. These are violations of Plaintiff decedent's Fourth and Fourteenth Amendment rights under the United States Constitution.

**80.**   Further, Defendant City of San Antonio and its officers are responsible for subjecting the decedent, a human being, to punishment and execution, without due process of law.

**81.**   In addition, Defendant City of San Antonio through its Police Department and its officers are also responsible for depriving plaintiff decedent, the decedent's wife, sons, parents, and brother of their right to the continued companionship and association of their husband, father, parents and brother without due process of law.

**82.** Further, the conduct of the Defendant City of San Antonio, through deliberately approving the defendant Police Department's policy, practice, or custom, as hereinabove set out, and as hereinafter will be set out has directly deprived, and is responsible for violating, the constitutional rights of the persons set forth in paragraph 70 A. through F. and likewise responsible for violating the decedent's right to life and to be free from deprivation of this right by the state, without due process of law.

**G.   Defendants' Clearly Violated SAPD General Manual Procedure 512 (Supp. 2008) Resulting  in Norman Cooper's Death.**

**(1) The Defendant City of San Antonio has admitted *never* following Procedure 512 (Supp. 2008) with respect to their training of officers on the use of ECDs' (tasers) in their Training Academy and therefore changed it after Norman Cooper's death to give the officers greater discretion in the use of electronic control devices (ECDs).** (emphasis added)

**83.** The conduct of the Defendant officers on April 19, 2015 clearly violated Procedure 512 of the SAPD General Manual regarding the use of electronic control devices with persons believed to be under the influence of drugs. Procedure 512 also prohibits the use of multiple ECDs on one suspect. [4] Specifically, the Defendant City promulgated Procedure 512 in October, 2008 to prevent

---

4   Procedure 512 (Supp. 2008) "concerning the phrase in the SAPD General Manual Procedure 512 - Electronic Control Devises, which read, "ECDs *shall not* be utilized in the following circumstances: *Against persons known to be under the influence of drugs.*" The "shall not" language in the procedure was found by the Academy Tactics staff to be in conflict with the manner in which officers had been and were being trained/certified with ECDs at the SAPD Training Academy as well as in conflict with the limitations and recommendations from the ECD manufacturer

serious bodily injury or death of an arrestee believed to be under the influence of drugs and to ensure the proper and constitutional use of electronic control devices (tasers). It is respectfully submitted however that the Defendant City has never in fact trained officers to comply with Procedure 512 thus constituting a custom in violation of the City's written policy. In fact, the Defendant City revised Procedure 512 in June of 2015 *in direct response* to the taser death of Norman Cooper and others to escape accountability and liability for Defendants' failure to train and adhere to Procedure 512.

**84.**   Incredibly, the City has changed a policy intended to protect persons from the dangers of electronic control devices (ECDs) or tasers, to a markedly less safe procedure for the use of electronic control devices. The City's own documents show that despite the implementation of Procedure 512 in 2008, the SAPD Training Academy and its instructors *never trained to the standard set forth therein*. [5] After it became an issue in Norman Cooper's death the City changed

---

(Taser International)."

[5]   Sometime around November of 2014, discussion began between the SAPD Training academy Tactics Supervisor (Sergeant Carmelo Vizcarrondo) and Tactics Coordinator (Officer Juan Mandujano), concerning the phrase in the SAPD General Manual Procedure 512 - Electronic Control Devices, which read, "ECDs *shall not be utilized in the following circumstances: Against persons known to be under the influence of drugs.*" The "shall not" language in the procedure was found by the Academy Tactics staff to be in conflict with the manner in which officers had been and were being trained/certified with ECDs at the SAPD Training Academy as well as in conflict with the limitations and recommendations from the ECD manufacturer (Taser International). The Training Academy Tactics staff made the recommendation to change the "shall not" language to "should not" in order to allow officers the opportunity to evaluate all the information they received at the scene before they decided to deploy or not deploy the ECD. In June of 2015, the language in the ECD procedure was changed to reflect the "should not" language and the revised procedure was released to all Department members.  It should be noted, the "shall not" language in the procedure was always in conflict with actual training practices of the SAPD Training Academy and the Tactics instructors who taught the ECD classes.  The SAPD Training Academy and its instructors have **never** taught officers that they shall not use an ECD on persons known to be under the influence of drugs.

Officer Oliver Flaig #0078 was Taser certified in 2012 and he attended Taser recertification each year (2013, 2014, 2015).

Officer Arnold Sanchez #0568 was Taser certified in 2013 and he attended Taser recertification each year (2014, 2015).

I have attached the ECD/Taser lesson plan, as well as the two versions of the general manual procedure, which shows that before-and-after change in the language in question. Please let me know if you need anything else.

Procedure 512 to give the officers unfettered discretion and thereby made interactions between police officers and arrestees less safe for other arrestees. This in turn made the officer's conduct less accountable.

## XIV.

## ATTORNEY FEES AND COSTS

**85.**   Plaintiffs incorporate by reference paragraphs 1 through 84 as if fully set forth herein. Plaintiffs are entitled to recover attorney fees and costs under 42 U.S.C. § 1988. As such, Plaintiffs request the Court to award costs and attorney fees incurred in Plaintiffs' prosecution of this litigation.

## XV.

## JURY TRIAL DEMAND

**86.**   Plaintiffs hereby demand a jury trial and tender the proper payment.

## XVI.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs request that Defendants be cited to appear and answer, and that on final trial Plaintiffs have:

1.   Judgment against defendants and/or each defendant for the actual and special damages suffered by the deceased Plaintiff and each of the survivor Plaintiffs as a result of the defendants' conduct in an amount within the jurisdictional limits of the court.

2.   Costs of suit.

3.   Prejudgment and post judgement interest as provided by law.

4.  Punitive damages for the wrongful and grossly negligent violations by the defendants, in their individual capacities, acting as jointly and severally, of the rights of the deceased.

5.  Attorney fees and costs including expert witness fees.

6.  Such other and further relief to which Plaintiffs may be justly entitled at law and/or in equity.

Respectfully submitted,

**EDWARD L. PIÑA & ASSOCIATES, P.C.**

*/s/ Edward L. Piña*
_____

**EDWARD L. PIÑA**
Attorney at Law
State Bar No. 16011352
**MATTHEW N. GOSSEN**
Attorney at Law
State Bar Number: 24069814
***The Ariel House***
8118 Datapoint Drive
San Antonio, Texas 78229
Telephone: (210) 614-6400
Facsimile: (210) 614-6403
E-mail: EPiña@arielhouse.com
E-mail: MGossen@gossenlaw.com
**ATTORNEYS FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the above and foregoing Plaintiff's First Amended Original Complaint has been served electronic filing to the following counsel:

N. Mark Ralls
Hoblit Darling Ralls Hernandez & Hudlow, LLP
300 Convent Street, Suite 1450
San Antonio, Texas 78205
(210) 224-9991 Telephone

(210) 226-1544 Facsimile
ATTORNEYS FOR OFFICER OLIVER FLAIG,
OFFICER ARNOLD SANCHEZ, AND
ANTHONY TREVINO, INTERIM
POLICE CHIEF

Michael D. Siemer
Assistant City Attorney
CITY OF SAN ANTONIO
Office of the City Attorney
Litigation Division
111 Soledad Street, 10th Floor
San Antonio, Texas 78205
Telephone: 210-207-8784
Facsimile:  210-207-4357
ATTORNEYS FOR DEFENDANT,
CITY OF SAN ANTONIO

on this 15th day of September, 2016.

*/s/ Edward L. Piña*

_____

**EDWARD L. PIÑA**