UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ESTATE OF NORMAN COOPER, ET. AL, | § | |
| | § | |
| *v.* | § | SA-16-CV-77-DAE |
| | § | |
| CITY OF SAN ANTONIO; ET. AL. | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE DAVID A. EZRA, SENIOR UNITED STATES DISTRICT JUDGE:

NOW COME Defendants **OFFICER OLIVER FLAIG and OFFICER ARNOLDO SANCHEZ** (hereinafter Defendants, or individually by name), and pursuant to Rule 56 of the Federal Rules of Civil Procedure, file this Defendants' Motion for Summary Judgment on the claims brought against them by the Estate of Norman Cooper, Deceased, Noble Cooper, Jennifer Cooper, Nathan Cooper, and Carly Lopez, Individually and As Next Friend of Nason Cooper and Nevon Cooper, Minors, and in support thereof would respectfully show the Court as follows:

**I.**

Defendants would show the Court there is no genuine issue as to any material fact upon which liability can be predicated in this matter on Plaintiffs' allegations and Defendants are entitled to judgment on the Plaintiffs' claims as a matter of law.  Defendants adopt, to the extent not inconsistent with any relief sought by these defendants, the City of San Antonio's Motion for Summary Judgment filed on even date herewith.

## II.
## <u>PLAINTIFFS' CLAIMS</u>

Plaintiffs purport to bring the following claims against the individual defendants: 1) claims for excessive force and failure to provide medical care under 42 U.S.C. § 1983 ("Section 1983); 2) Negligence and gross negligence in the use of the handcuffs and TASER under the Texas Tort Claims Act and under Section 1983; and, 3) State Tort Claims for negligence under the Texas Tort Claims Act.

## III.
## <u>THE ESTATE OF NORMAN COOPER'S CLAIMS AGAINST DEFENDANTS SHOULD BE DISMISSED BECAUSE THE ESTATE OF NORMAN COOPER LACKS CAPACITY TO BRING THIS SUIT</u>

The Plaintiffs' live pleading is Plaintiffs' Second Amended Original Complaint (hereinafter Complaint).[1] Plaintiffs allege in their Complaint, the "Plaintiffs in this action are the Estate of Norman Cooper, Deceased. . . ".[2] Plaintiffs' Complaint subsequently alleges a claim is being brought by the Estate of Norman Cooper, Deceased, seeking recovery of damages as a result of ". . . personal injuries. . . ." Plaintiffs' Complaint states the claim is brought ". . . by and through the ESTATE OF NORMAN COOPER, DECEASED. . . ."[3]

Plaintiffs do not again refer to a claim on the part of the Estate, with the possible exception of the language in ¶ 45, wherein they state they,

> . . . as legal heirs of the deceased's estate, [are entitled] to recover for the physical pain and mental suffering of the deceased, for the loss of the decedent's civil rights, and for the emergency medical service and funeral expenses and other expenses directly and proximately resulting from the defendants' violations as herein before alleged.[4]

---

[1] Docket No. 29.
[2] See, Id., at ¶ 2.
[3] See, Id., at ¶¶ 48-50,
[4] Id., at ¶ 74.

Although Plaintiffs do not specifically plead they are bringing a survivorship claim, to the extent Plaintiffs' Complaint can be read to assert a survivorship claim, it should be dismissed. "A comprehensive federal statute covering survival of actions arising under federal law does not exist." [5] As in wrongful death actions, survival actions under § 1983 are governed by 42 U.S.C. § 1988, which directs the courts to look to the law of the forum state. [6] A survival claim belongs to the decedent because it arises from injuries sustained while the decedent was alive. [7] A survival action "preserves a claim for the estate rather than creating a new cause of action for those surviving the decedent." [8] Section 71.021 of the Texas Civil Practice and Remedies Code provides that "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person." [9] In Texas, only a properly-appointed legal representative can sue on behalf of an estate. [10] Generally, "only the estate's personal representative has the capacity to bring a survival claim." [11] In this case, none of the Plaintiffs allege they are suing in a representative capacity on behalf of the Estate of Norman Cooper.  Nor is there any allegation any of the Plaintiffs have been appointed as the personal representative of the Estate of Norman Cooper.  And, while an heir may sue on behalf of an estate, it is only under limited circumstances.  Heirs at law may maintain a survival suit if they allege and prove that there is no

---

[5] *Hamilton v. Rogers*, 573 F. Supp. 452, 453 (S.D. Tex. 1983).
[6] *Robertson v. Wegmann*, 436 U.S. 584, 98 S. Ct. 1991, 56 L. Ed. 2d 554 (1978).
[7] *Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 849-50 (Tex. 2005).
[8] *See Pluet v. Frazier*, 355 F.3d 381, 383 (5th Cir. 2004).; *See also Austin Nursing Center, Inc. v. Lovato*, 171 S.W.3d 845, 849-50 (Tex. 2005).
[9] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.021 (Vernon Supp. 2009).
[10] *Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998); *Frazier v. Wynn*, 472 S.W.2d 750 (Tex. 1971); *See Johnson v. Holly Farms of Texas, Inc.*, 731 S.W.2d 641, 647 (Tex.App.-Amarillo 1987, no writ).
[11] *Austin Nursing Center*, 171 S.W.3d at 850 (*citing Frazier v. Wynn*, 472 S.W.2d 750, 752 (Tex. 1971)).

administration pending and none is necessary.[12] Plaintiffs have not alleged that no administration of the Estate of Norman Cooper is pending or necessary. Consequently, Defendants respectfully submit they are entitled to summary judgment on any claims on behalf of the Estate of Norman Cooper.

## IV.
## DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS OF NATHAN COOPER AS HE HAS NO CAUSE OF ACTION

**Nathan Cooper has no cause of action under Section 1983.**

"Plaintiff Nathan Cooper ("Nathan") is the brother of the decedent, Norman Cooper, and the uncle of Nason Cooper and Nevon Cooper."[13]  Plaintiffs' Complaint is not clear exactly what cause(s) of action Nathan Cooper is asserting in this case.  Nathan Cooper alleges a bystander claim as a result of watching the interaction between the defendants and Norman Cooper and being present at the time of Norman's death.[14]  He claims he is entitled to recover numerous categories of damages, many of which would only be available under the Texas Wrongful Death Act or Survivorship Act, adding up to "at least $1,772,000.00".[15]

To the extent Nathan Cooper asserts a bystander claim under Section 1983, Defendants respectfully submit they are entitled to judgment as a matter of law on that claim.  To assert a violation of his civil rights, Nathan Cooper's personal rights must have been violated.  "A bystander who witnesses a police action, but who is not himself an object of that action, cannot recover for any resulting emotional injuries under § 1983, although there may be such a claim

---

[12] *Austin Nursing Center*, 171 S.W.3d at 850-51 (*citing Shepherd*, 962 S.W.2d at 31-32).
[13] Docket No. 29, p. 3, ¶ 6.
[14] Id., at p. 37, ¶ 59.
[15] Id., at subparts a.-k.

under state tort law. There is no constitutional right to be free from witnessing police action.[16]

Nathan Cooper does not allege he suffered a violation of his personal civil rights.  Defendants

submit therefore, they are entitled to judgment as a matter of law on his bystander claim to the

extent it is brought under Section 1983.

**Nathan Cooper's state tort bystander cause of action against Flaig and Sanchez is barred.**

Defendants Flaig and Sanchez are entitled to summary judgment on any state tort

bystander claim Nathan Cooper may be attempting to assert, for the reason Plaintiff's state tort

claims against them are barred by the election of remedies provisions of the Texas Tort Claims

Act, § 101.106, *et seq.,* as set forth below.

**To the extent Nathan Cooper asserts a Wrongful Death or Survivorship Claim, Defendants are entitled to Summary Judgment on those claims.**

Although it is not clear Nathan Cooper is pursuing a wrongful death or survivorship claim

in this case, the compensatory damages he seeks in his pleading are damages that are typically

sought in a suit by a wrongful death beneficiary or the personal representative of an estate in a

survivorship claim.[17]   Nathan Cooper has no standing to maintain a wrongful death claim or

survivorship claim.  Nathan Cooper is not a named beneficiary under the Texas Wrongful Death

Act.  "Pursuant to 42 U.S.C. § 1988, the Court must look to Texas state law to determine whether

[Nathan Cooper] has standing to assert [a] wrongful death claim[] under 42 U.S.C. § 1983. The

Texas wrongful death statute provides that only the decedent's spouse, children, and parents may

---

[16] *Thomas v. Frederick*, 766 F.Supp. 540, 556 (W.D.La., 1991), citing *Grandstaff v. Borger*, 767 F.2d 161, 172 (5th Cir. 1985), *cert. denied* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). *See also, Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986); *Archuleta v. McShan*, 897 F.2d 495 (10th Cir. 1990).  *See also, Young v. Green,* 2012 WL 3527040, *11-12 (S.D. Tex. 2012).
[17] See, ¶ 59, a.-j.

bring an action for wrongful death."[18]  In the *Fuller* case, the court granted defendants' motion for summary judgment on the decedent's sister's wrongful death claim on the basis she was not a named statutory beneficiary under the wrongful death statute and therefor had no standing to pursue a wrongful death claim for her brother's death.[19]

Nor does Plaintiffs' Complaint allege Nathan Cooper is pursuing a claim on behalf of the Estate of Norman Cooper.  Nor has Nathan Cooper produced any evidence he has been appointed as the personal representative of the Estate of Norman Cooper.  Therefore, he lacks standing and capacity to present a survivorship claim on behalf of the Estate of Norman Cooper.

Defendants respectfully submit, that to the extent Nathan Cooper is attempting to pursue a wrongful death claim or a survivorship claim, they are entitled to summary judgment as a matter of law on both.

**Defendants Flaig and Sanchez are entitled to summary judgment on Noble Cooper and Jennifer Cooper's punitive damages claims.**

Defendants are entitled to a judgment as a matter of law on Noble Cooper and Jennifer Cooper's claims for punitive damages for the reason they, as the parents of the decedent, Norman Cooper, are not "heirs" of the decedent as defined by the Texas Constitution and common law of the State of Texas.

It is clear under the provisions of Article XVI, § 26, of the Texas Constitution as interpreted by *General Chemical Corp. v. De La Lastra*, 852 S.W.2d 916 (Tex. 1993), that parents of a deceased cannot recover punitive damages for the death of the decedent.  The

---

[18] *Fuller v. City of Houston*, 2005 U.S. Dist. LEXIS 34027, *3 (S.D. Tex. 2005), *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.004 (Vernon 1997).
[19] *Fuller*, at *3.

section of the Texas Constitution permitting the recovery of punitive damages in a wrongful

death case states as follows:

> Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.[20]

In the *De La Lastra* case, the Texas Supreme Court interpreted the Constitutional

provision as excluding parents from the class of persons authorized to recover punitive damages

under the act, stating:

> At common law, a cause of action for personal injuries and the right to exemplary damages for the willful or wanton conduct of the tortfeasor terminated with the deceased.  In order to give the decedent's survivors an available remedy, Texas passed the Wrongful Death Act.  However, this Act was said to have created a new cause of action, as opposed to a mere continuation of the deceased's cause of action, and thus the right to recover exemplary damages still terminated upon the death of the decedent.  The constitutional provision was enacted to allow the survivors to recover exemplary damages.

> It is well established that this provision defines the class of persons who are entitled to recover punitive damages for wrongful death; parents of the deceased, while they are entitled to maintain an action under the Wrongful Death statute, are not included in article XVI, § 26 and are therefore unable to recover punitive damages. The Wrongful Death statute cannot broaden the class of persons entitled to recover punitive damages beyond the scope of article XVI, § 26 of the constitution.  In 1889 this Court, analyzing the relationship between article XVI, § 26 and the Wrongful Death Act said, the right to maintain an action for the recovery of exemplary damages for the death of a person ... is confined to the class of persons who, by the terms of the constitution, are designated as entitled to maintain such action; namely the surviving husband or wife, or heirs of the body, of the deceased, and not to the parent.[21]

---

[20] TEX. CONST. art.  XVI, § 26.
[21] *General Chemical Corp. v. De La Lastra*, 852 S.W.2d 916, 922-923 (Tex. 1993)(Internal citations and quotation marks omitted); *See, also, Brown v. Wichita Cty.,* 2008 U.S. Dist. LEXIS 60679, *25-26 (N.D. Tex. 2008).

Based upon the foregoing, Defendants submit they are entitled to summary judgment as a matter of law on the claims of Noble Cooper and Jennifer Cooper for punitive damages in this action.

## V.
## QUALIFIED IMMUNITY

Defendants have pled the defense of Qualified Immunity.  "A qualified immunity defense serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law."[22] Once a Defendant pleads the affirmative defense of qualified immunity, the burden shifts to the Plaintiff, who must rebut the defense by establishing a Defendant's allegedly wrongful conduct violated clearly established law.[23]  The plaintiff cannot meet his burden based on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct.[24]  "To discharge this burden, a plaintiff must satisfy a two-prong test.  First, he must claim that the defendants committed a constitutional violation under current law.  Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."[25]

---

[22] *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005)(Internal quotations omitted).
[23] *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001); *See also, McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).
*Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245 *, 2005 U.S. App. LEXIS 23825.
[24] *Id.*
[25] *Atteberry,* at 253.(Internal citations omitted).

This is a demanding standard: Because qualified immunity protects all but the plainly incompetent or those who knowingly violate the law, we do not deny its protection unless existing precedent places the constitutional question beyond debate[.] To defeat qualified immunity, the plaintiff must show that the official's conduct was objectively unreasonable in light of a clearly established rule of law. The court must ask whether the law so clearly and unambiguously prohibited [the official's] conduct that every reasonable official would understand that what he is doing violates [the law]. Although a case directly on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful. Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right clearly in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case.[26]

The Fifth Circuit clarified the standard further in the recent case of *McLin v. Ard*, a Fourth Amendment seizure case, in which the Court stated,

When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].'" *Morgan*, 659 F.3d at 371 (quoting *al-Kidd*, 563 U.S. at 741); see also *Lane v. Franks*, 134 S. Ct. [*696] 2369, 2381, 189 L. Ed. 2d 312 (2014) (noting that the right must be clearly established "at the time of the challenged conduct"). "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371-72 (internal quotation marks omitted) (quoting *al-Kidd*, 563 U.S. at 742); see also *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) ("The dispositive question is whether the violative nature of particular conduct is clearly established." (internal citation and quotation omitted)). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Morgan*, 659 F.3d at 372.[27]

The two-prong test regarding the qualified immunity analysis may be conducted in any sequence.[28] "If the Defendant's conduct did not violate a Plaintiff's constitutional rights under the

---

[26] *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)(internal and external citations, and internal quotations omitted).

[27] *McLin v. Ard,* 866 F.3d 682, 695-696 (5th Cir. 2017).

[28] *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

first prong, or his conduct was objectively reasonable under the second prong, he is entitled to qualified immunity."[29]  "Even officers who interpret the law mistakenly but reasonably are entitled to immunity."[30]  "An official is eligible for qualified immunity even if the official violated another's constitutional rights"[31]  "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact."[32]  "As a matter of public policy, qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law."[33]  At least in situations where the Officers' actions are distinguishable, the Court should determine each individual Defendant's entitlement to qualified immunity separately.[34]

## VI.
## EXCESSIVE FORCE

Plaintiffs claim Defendants Flaig and Sanchez used excessive force to effect the detention of Norman Cooper.  Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred."[35]  A plaintiff alleging a Section 1983 claim for the use of excessive force under the Fourth Amendment must show that he: To prevail on an excessive-force claim, Plaintiffs must establish, an "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[36]  "The Supreme Court has made clear that 'all claims that law enforcement officials have used excessive force--deadly or not--in the course

---

[29] *Blackwell v. Laque*, 275 Fed. Appx. 363, 366 (5th Cir. La. 2008), citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007).
[30] *Flores v. City of Palacios*, 381 F.3d 391, 399-400 (5th Cir. 2004).
[31] *Thompson v. Upshur County TX*, 245 F.3d 447, 457 (5th Cir. 2001).
[32] *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005).
[33] *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
[34] *See Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir 2007).
[35] *Baker v. McCollan*, 443 U.S. 137, 145, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979).
[36] *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir. 2009).

of an arrest, . . . or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard."[37]   "[T]he amount of force that is constitutionally permissible must be judged by the context in which the force is deployed."[38]   "Fourth Amendment jurisprudence has long recognized that the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[39].   Law enforcement officers are often required to use force during the course and scope of their duties and "'[ not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."[40].   The Supreme Court in *Graham* set forth a list of factors courts should consider, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight".[41]   However, two years after deciding *Graham*, the Supreme Court, in *Saucier v. Katz,* stated,

> *Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances. . . . [T]he law must be elaborated from case to case.   Qualified immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."[42]

Moreover, ". . . neither the Supreme Court nor [the Fifth Circuit] has ever held that *all* of the *Graham* factors must be present for an officer's actions to be reasonable; indeed, in the typical

---

[37] *Holland v. City of Houston*, 41 F. Supp. 2d 678, 689 (S.D. Tex. 1999) (*citing Graham v. Connor*, 490 U.S. 386, 395; 104 L.Ed.2d 443; 109 S.Ct. 1865 (1989).
[38] *Holland*, 41 F. Supp. 2d at 691 (*citing Baldwin v. Stalder*, 137 F.3d 836, 840 (5th Cir. 1998)).
[39] *Graham v. Connor*, 490 U.S. 386,396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1,22-27 (1968))
[40] *Id.* at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973))
[41] *Graham*, 490 U.S. at 396.
[42] *Saucier v. Katz, 533 U.S. 194, 205-206, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272, 284, (2001)*(internal citations and quotation marks omitted).

case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others."[43]   Turning to the case *sub judice*, it is undisputed that all times relevant to Plaintiffs' claims, Flaig and Sanchez were acting within their discretionary authority and within the course and scope of their employment with the San Antonio Police Department. As stated in detail in the Appendix to Defendants' Motion for Summary Judgement, Flaig received a dispatch call for a family disturbance for an intoxicated male family member who refused to leave the location.[44] When Flaig arrived at the location, he noticed an SUV parked partially in the driveway and partially on the sidewalk, with the driver's door open and the engine running.[45] When Flaig approached the front door of the residence, he heard shouting inside the home.[46] When he entered, Nathan Cooper began telling him that Norman had broken the door and was not supposed to be there.[47] Flaig saw the front door was damaged at the frame and the trim was dangling and broken.[48]  Flaig then saw Norman advancing toward him from the living room of the house.[49] Norman was not wearing a shirt, his belt was undone, his pants were loose, and he looked to be sweating.[50] Norman was rambling, loud, and confrontational.[51] As Norman was loudly shouting, Nathan began to explain to Flaig that Norman broke into the house, and that

---

[43] *Rockwell v. Brown*, 664 F.3d 985, 992, (5th Cir. 2011).
[44] Exhibit "G", p. 1.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*

Nathan was scared of Norman.[52]  Flaig attempted to calm Norman, repeatedly asking him to "cool down" and "chill out."[53]

A short time after Flaig arrived, Sanchez arrived.  Sanchez had a conversation with Nathan.  Nathan told Sanchez that his parents, Jennifer and Noble Cooper, were out of town and the house belonged to them.[54] Nathan told Sanchez that Norman had broken into the home, was causing a disturbance, and was refusing to leave.[55] Nathan also told Sanchez that he did not know if Norman had a gun, and that when Norman was on drugs "he scared the crap out of [Nathan]."[56]

A short period after Flaig and Norman went upstairs to retrieve Norman's identification, and entered a small bedroom, Norman began aggressively approaching Flaig and then backing away as he was shouting.[57] Norman did that repeatedly.[58] Flaig became uncomfortable with Norman's behavior at that point.[59] By that time, Sanchez had entered the room with them.  Flaig again asked Norman to produce his I.D., and Norman again ignored Flaig's request.[60] Norman continued moving his hands around and approaching Flaig aggressively.[61] Based on Norman's aggressive behavior, apparent intoxication, sweaty appearance, and the broken door frame, Flaig made the decision the situation warranted an emergency detention because Norman appeared to be a danger to himself and the officers.[62]   Both Flaig and Sanchez repeatedly commanded

---

[52] *Id.*
[53] *Id.*
[54] Exhibit "H", p. 2.
[55] *Id.*
[56] Exhibit "H-1" at 5:36.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] Exhibit "G", p. 3.
[61] *Id.*
[62] *Id.* See, *Cantrell v. City of Murphy*, 666 F.3d 911, 923, (5th Cir. 2012)(citing elements for emergency detention under Tex. Health & Safety Code § 573.001).

Norman to turn around and put his hands behind his back.[63]   Norman refused repeatedly, even after Sanchez pointed his Taser at him and told Norman he was going to have to tase him.[64]   In spite of Norman's refusal to comply, Sanchez holstered his Taser and he and Flaig attempted to use their physical strength to get Norman's hands behind his back in order to handcuff him.[65]   Norman actively resisted their attempts to detain him by pulling his arms out of the officers' grasps, resisting their attempts to handcuff him.[66]   Norman then picked up an opened laptop off the desk and was trying to explain something on it.[67]   Both officers unholstered their Tasers at that time.[68]   During the ensuing struggle, Flaig was the first to deploy his Taser's probes at Norman.[69]   Flaig saw one probe hit Norman, but did not see the other.[70]   It had no effect on Norman.[71]   Sanchez then deployed his Taser's probes which struck Norman.[72]   Flaig saw Norman's chest flex and get stiff.[73]   Norman fell to the floor, but the officers could not get to him because he fell behind the desk.[74]   Norman then got up on his feet, but continued to refuse to comply.[75]   Flaig's baton had fallen to the floor, and he was concerned that if Norman got it he could use it on Flaig or Sanchez.[76]   Flaig deployed his Taser again, but it was again ineffective

---

[63] Exhibit "G", p. 3; Exhibit "H", p. 3.
[64] Exhibit "G", p. 3.
[65] Exhibit "G", p. 4; Exhibit "H", p. 3.
[66] *Id.*
[67] Exhibit "G", p. 4.
[68] *Id.*
[69] Exhibit "G", p. 4; Exhibit "H", p. 3.
[70] Exhibit "G", p. 4.
[71] *Id.*; Exhibit "H", p. 3.
[72] *Id.*
[73] Exhibit "G", p. 4.
[74] *Id.*
[75] *Id.*
[76] *Id.*

because he was too close to Norman.[77]  Sanchez then deployed his Taser for the second time, and it was again effective.[78]  Norman fell to the ground, on his stomach, at which time Flaig got his right arm, and Sanchez got his left arm.[79]  Flaig was able to use Sanchez' handcuffs to handcuff Norman at that time, in spite of the fact Norman continued to resist.[80]  Sanchez then radioed for EMS and a supervisor for a Taser deployment.[81]  Flaig radioed for more officers.[82]  Even after he was handcuffed, and on the ground, on his stomach, Norman continued to kick violently.[83]  Sanchez was trying to hold Norman's legs, but Norman kicked him off twice.[84]  Because Norman continued kicking, Flaig asked the first responding officer to bring leg irons.[85]  Norman suddenly stopped struggling while he was face down and, Flaig and Sanchez turned him on his right side on his right shoulder and pelvic area.[86]  He was still breathing at that time.[87]  When Norman stopped struggling, Flaig did not know whether it was because he was taking a breather or his condition had declined.[88]  Flaig asked EMS to step it up, because he was concerned for Norman's condition, and wanted to ensure his wellbeing.[89]   Norman was still breathing, and both Sanchez and Flaig checked his pulse and found a pulse.[90]  They did not start chest compressions on Norman, because

---

[77] *Id.*
[78] *Id.*
[79] *Id.*; Exhibit "H", p. 3.
[80] Exhibit "G", p. 4.
[81] Exhibit "G", p. 4; Exhibit "H", p. 3.
[82] Exhibit "G", p. 4.
[83] Exhibit "H", p. 3.
[84] *Id.*
[85] Exhibit "G", p. 4.
[86] *Id.*; Exhibit "H", p. 4.
[87] Exhibit "G", pp. 4-5.
[88] Exhibit "G", p. 5.
[89] *Id.*
[90] Exhibit "G", p. 5; Exhibit "H", p. 4.

he was still breathing.[91]   Sanchez believed Norman was exhausted from the struggle, but was monitoring his condition.[92]   Sanchez placed a pillow under Norman's head to make him more comfortable.[93]   Flaig never saw Norman stop breathing.[94]   After EMS arrived, Flaig left the room.[95]   Sanchez stayed with Norman until shortly after EMS arrived.[96]   After EMS reported Norman was unresponsive, the handcuffs were removed so Norman could be treated.[97]

According to Nathan Cooper, he heard at least one Taser go off as he was going up the stairs to the room where the struggle was going on.[98]   Nathan Cooper provides conflicting versions of what he saw when he first looked in the door of the room.  In one, he claims he saw an officer standing over Norman, and a Taser wire moving as though it were delivering a shock.[99]   In the other, he says when he looked in the room he saw both officers on Norman's back as they were trying to handcuff him.[100]  In the latter version, he says Sanchez got off Norman's back within twenty (20) seconds of handcuffing him, and Flaig got off Norman's back before Sanchez did.[101]   He claims Norman was not moving at all, as he was being handcuffed.[102]   Although Nathan Cooper testified he believed Sanchez was applying pressure to Norman's back as they finished handcuffing him, he cannot say whether it was with Sanchez' knee or elbow, and he

---

[91] Exhibit "G", p. 5.
[92] Exhibit "H", p. 4.
[93] *Id.*
[94] Exhibit "G", p. 5.
[95] *Id.*
[96] Exhibit "H", p. 4.
[97] *Id.*
[98] Exhibit "B", p. 45.
[99] *Id.* at p. 123.
[100] *Id.* at pp. 126-127.
[101] Exhibit "B", pp. 134-135.
[102] *Id.* at p. 126.

cannot say to what part of Norman's back.[103]   According to the officers, they rolled Norman onto

his side after they completed handcuffing him.[104]   Nathan Cooper denies the officers took any

action.[105]   Critical to the qualified immunity analysis in this case, neither Flaig nor Sanchez Tased

or used any force against Norman after he was handcuffed.[106]

**Plaintiffs' allegations as to "Unannounced and Unconented Entry by SAPD Officers**

Plaintiffs allege that neither Defendant Flaig nor Sanchez announced their presence upon

arriving at the Coopers' residence, and that both walked in the house without the consent of

Nathan Cooper.[107]   Plaintiffs' do not allege a particular constitutional violation as a result of

Officer Flaig and Sanchez entering the house.   However, Defendants will assume Plaintiffs are

claiming a Fourth Amendment violation for warrantless entry into the home.   Initially, Nathan

Cooper made the 9-1-1 call to which the officers were responding, so at the least he invited the

presence of the officers at the house.[108]   Moreover, Nathan Cooper stated in his sworn statement

given the morning of the incident to Detective Hines that he let Flaig in the house.[109]   Officer

Flaig testified in his deposition that when he approached the house, the door was unlocked, and

when he pushed on it, it opened.[110]   He then saw whom he later learned to be Nathan Cooper

walking down the hall toward him.[111]   He entered the house "possibly simultaneously" with

Nathan Cooper getting to him, although Nathan Cooper never specifically invited Flaig into the

---

[103] *Id*. at pp. 133-135.
[104] Exhibit "G", p. 5; Exhibit "H", p. 4.
[105] Exhibit "B", p. 55.
[106] Exhibit "B", pp. 136-137; Exhibit "G", p. 4.; Exhibit "H", p. 3;
[107] Docket No. 29, at p. 5, ¶ 16.
[108] Exhibit "A-1'.
[109] Exhibit "K", p. 1.
[110] Exhibit "F", p. 48 -49.
[111] *Id.,* at, p. 49.

house.[112] Nathan told Flaig that his brother was not supposed to be there, and that his brother had broken the door.[113]

When Officer Sanchez arrived, he spoke to Nathan Cooper outside the home and identified him as the 9-1-1 caller.[114]   Officer Sanchez could hear Officer Flaig's voice in the house, and hear that it was raised.[115]  As stated above, Nathan told Sanchez that he did not know if Norman had a gun, and that when Norman was on drugs "he scared the crap out of [Nathan]."[116] Nathan told Officer Sanchez that Nathan Cooper told Officer Sanchez there was a disturbance inside the house, at which point Officer Sanchez entered the house without a specific invitation from Nathan Cooper to do so.[117]   Although Flaig and Sanchez may not have been invited into the home, Nathan had made a 9-1-1 call to which they responded, and he did not tell either officer not to enter the home.  Flaig and Sanchez submit it was objectively reasonable for them to believe Nathan Cooper consented to their entry into the home under the totality of the circumstances with which they were confronted.  Under the Fourth Amendment, a warrantless intrusion into a person's home is "presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify" the intrusion.[118]

**Plaintiffs' allegations as to excessive force.**

In their complaint, Plaintiffs claim that "[a]t all times material hereto, Defendants had a duty to protect the bodily integrity of the decedent and secure his constitutional rights to be free

---

[112] *Id.*, at p. 49-50.
[113] *Id.*, at p. 49.
[114] Exhibit "R", p. 35.
[115] Id., at p. 34
[116] Exhibit "H-1" at 5:36.
[117] Id., at p. 35.
[118] *Rockwell v. Brown*, 664 F.3d 985, 994, (5th Cir. 2011)(external citation omitted).

from the use of excessive force."[119]   Plaintiffs further claim "[t]he officers were clearly aware of Norman Cooper's right to be free of unreasonable seizures under the Fourth Amendment . . . and nevertheless violated this right when they each tased him multiple times."[120]   Plaintiffs further claim ". . . the Defendants knew Norman Cooper was under the influence of drugs yet intentionally disregarded their Department's policy prohibiting the use of a Taser against a citizen under the influence of drugs."[121]   Plaintiffs claim, that, "[i]n combination with his hands being handcuffed behind his back and placed face down on the ground in a prone position with weight on his back, restricting his ability to breathe, the force was exceedingly dangerous and lethal."[122]

Defendants Flaig and Sanchez admit that at the time of the incident made the basis of this lawsuit, a person had a Fourth Amendment right to be free from the use of excessive force during an arrest or detention.   However, they submit the force they used to detain Norman Cooper was objectively reasonable under the totality of the circumstances with which they were confronted, and that they did not violate Norman Cooper's Fourth Amendment rights.   Therefore, they submit they are entitled to summary judgment on Plaintiffs' Fourth Amendment claim.

Additionally, under the second prong of the qualified immunity analysis, Flaig and Sanchez contend that tasing a non-compliant person multiple times to subdue that person, under the totality of the circumstances with which they were confronted, was not so clearly and unambiguously prohibited that every reasonable official would understand that what he is doing violates the law.   Flaig and Sanchez had no reasonable warning that deploying their tasers at Cooper multiple times during the course of effecting his detention (particularly given that only

---

[119] Docket No. 29, p. 19 at ¶ 62.
[120] *Id.*
[121] *Id.*
[122] *Id.*

two taser strikes were effective), would violate Cooper's constitutional rights.  At the time of the incident there was no binding caselaw on the appropriate use of tasers on a person physically resisting arrest or detention, *prior to* the time the person quit physically resisting arrest or detention.  To defeat Flaig and Sanchez' summary judgment on qualified immunity, Plaintiffs must show that the law was so clear, under reasonably analogous circumstances confronted by Flaig and Sanchez, that no reasonable officer would have used the amount of force they used.[123] Plaintiffs rely on the Fifth Circuit's opinions in *Newman v. Guedry,* 703 F.3d 757, 763 (5th Cir. 2012), and *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013), two cases in which the plaintiffs were tased, for the proposition "[q]ualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel."  However, the Fifth Circuit, in the case of *Bailey v. Preston,* 2017 U.S. App. LEXIS 12687, *6-7, 2017 WL 2992211 (5th Cir. 2017), has distinguished the decisions in the cases relied upon by Plaintiffs from cases, where, although a suspect was tased multiple times, the officers involved stopped using force against the suspect after he was restrained and handcuffed. In *Bailey,* the Court stated,

> In their brief, the appellants failed to address whether the officers' force was excessive in light of clearly established law. When pressed at oral argument, counsel for appellants cited *Ramirez v. Martinez* as demonstrating that in 2011 the law was clearly established that the force the officers used in this case was excessive. But *Ramirez* is distinguishable. The plaintiff in *Ramirez* alleged that he "posed no threat to the officers and yet was tased twice, including once after he was handcuffed and subdued while lying face down on the ground," and the district court found that the plaintiff's account was supported by the summary-judgment record. In *Ramirez*, this court emphasized that, although our circuit has "not addressed a fact pattern precisely on point, . . . we have held the use of certain force *after* an arrestee has been restrained and handcuffed is excessive and unreasonable.
>
> The *Ramirez* panel concluded that the officer's alleged conduct violated clearly established law. It relied on *(1) Newman v. Guedry,* in which another panel of this

---

[123] See, *Brosseau v. Haugen,* 543 U.S. 194, 201, 125 S. Ct. 596, 600, 160 L. Ed. 2d 583 (2004).

court had explained in 2012 that the "[l]awfulness of force . . . does not depend on the precise instrument used to apply it," and (2) *Bush v. Strain*, in which "we held an officer used excessive and unreasonable force when he forcefully slammed an arrestee's face into a vehicle when the arrestee was handcuffed and subdued." These cases are inapposite here because the uncontroverted evidence reflects that the officers in the instant case stopped using force on Abernathy once he was handcuffed.[124]

In the case at bar, Nathan Cooper testified he did not see Norman Cooper tased after he was handcuffed, and that after Norman was handcuffed, no additional force was used by Flaig or Sanchez against Norman.[125]  Thus, as in the *Bailey* case, the uncontroverted evidence in the instant case is that neither Flaig nor Sanchez used any force on Norman Cooper after he was handcuffed.  Consequently, Defendants submit, that based on the Fifth Circuit's holding in *Bailey v. Preston*, Flaig and Sanchez are entitled to summary judgment on their qualified immunity defense.[126]

Defendants have also attached to the Appendix to Defendants' Motion for Summary Judgment as summary judgment evidence, the affidavit of Albert Ortiz, Defendants' testifying

---

[124] *Bailey v. Preston*, 2017 U.S. App. LEXIS 12687, *6-7, 2017 WL 2992211 (5th Cir. 2017)(emphasis in original)(distinguishing *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013); *Newman v. Guedry*, 703 F.3d 757, 766 (5th Cir. 2012); and *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)). *See also, McLin v. Ard*, 866 F.3d 682, 695-696, (5th Cir. 2017); *See also, Bussey-Morice*, 587 F. Appx. 621, 628 (11th Cir. 2014)(agreeing with the district court that no decision from the United States Supreme Court has clearly established that an officer's repeated use of a Taser constitutes excessive force under circumstances identical to these.)

[125] Exhibit "B", p. 137, ll.20-22.

[126] The *Bailey* Court, in a footnote, stated "[o]ur holding is limited to the circumstances of this case and is based solely on the appellants' failure to demonstrate that Abernathy's right to be free from the force used was *clearly established*. We note that an officer's repeated tasing of a non-dangerous, even non-compliant suspect could constitute a violation of the suspect's clearly established Fourth Amendment rights, especially given the advancing medical and scientific knowledge about the potential deadly effects of tasing." *Bailey*, at *8, n. 27(emphasis in original). However, the Court's qualified note that repeated tasing "could" constitute a violation of a non-compliant suspect's clearly established Fourth Amendment rights, is obviously prospective in application and could not have put Flaig and Sanchez on notice of a clearly established right on the part of a suspect to be free from repeated use of a taser to overcome his resistance to arrest, prior to the time they were attempting to subdue Cooper.

expert, along with his curriculum vitae, labeled as Exhibit "I", and incorporated herein for all purposes as though set forth herein verbatim. As evidenced by his affidavit, Mr. Ortiz conducted an exhaustive review of Plaintiffs' Second Amended Complaint and Defendants' actions in this case.  He also reviewed Officers Flaig and Sanchez' TCOLE Resumes and SAPD Academy Transcripts.

Relying on his extensive background in law enforcement, Mr. Ortiz opines that Defendants were acting within the course and scope of their employment, were exercising their discretionary authority and that their actions in connection with the incident involving Norman Cooper were objectively reasonable.  In his review of the case, Mr. Ortiz found, among other things, that according to the sworn statement Nathan gave the morning of the incident, he let Flaig inside the house.[127]

According to Mr. Ortiz' review of the case, including the COBAN recordings of the incident, during the encounter, prior to the decision to handcuff Norman, Flaig can be heard using various de-escalation techniques, including calling Norman's name, asking him to "chill out" or "snap out of it" over thirty times.[128]  For the most part Flaig was talking in a normal tone of voice, although when necessary to be heard above Norman, Flaig would raise his voice from a normal tone to a loud, clear, command voice.[129]  After Flaig made the decision to detain Norman, he can be heard commanding Norman twice to put his hands behind his back, which Norman refused to do.[130]  During the ensuing violent struggle to handcuff Norman, the officers ordered Norman to put his hands behind his back about twenty-one times, turn around about fourteen times, get on

---

[127] Exhibit "I", p. 5; Exhibit "K", p. 1.
[128] Exhibit 'I', pp. 5-6.
[129] *Id*. at p. 5.
[130] *Id*. at p. 6.

the ground twice, and to stop resisting.[131]   They can also be heard warning Norman that if he continued to refuse to comply they would tase him.[132]

Mr. Ortiz continued, stating, when the officers' presence, commands, physical strength and agility did not overcome Norman's resistance, the officers deployed their Tasers.[133]   The fact the Taser downloads indicate the officers discharged their Tasers a total of nine times does not mean that each discharge was successful in delivering an electrical charge to Norman.[134]   The officers reported that they recognized the Taser probes did not always make appropriate contact with the deceased and therefore did not deliver a charge.[135]

The officers had probable cause to arrest Norman for any of the violations he committed including Criminal Trespass, Criminal Mischief, or Public Intoxication, or Burglary.[136]   When Norman picked up a laptop computer for no apparent reason, the officers realized he could use it as a weapon against them.[137]   They made the discretionary decision to take Norman into custody based on the totality of the circumstances with which they were faced.[138]   Based upon his review of the record in this case, Mr. Ortiz opines, among other things,

> The officers had a duty to prevent an assault which could have resulted in serious
> bodily injury or death.  The officers had probable cause to arrest Norman for any
> of the violations he committed including Criminal Trespass, Criminal Mischief, or
> Public Intoxication, or Burglary.  When Norman picked up a laptop computer for
> no apparent reason, the officers realized he could use it as a weapon against them.
> They made their discretionary decision to take Norman into custody based on the
> totality of the circumstances with which they were faced.

---

[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] *Id.* at p. 10.
[135] *Id.*
[136] *Id.* at pp. 10-11.
[137] *Id.* at p. 11.
[138] *Id.*

It is my opinion the actions of Officers Flaig and Sanchez, including their uniformed presence at the scene, their use of verbal communication skills, open-handed techniques, physical strength and agility, handcuffing, and use of their TASER against Norman, comply with the SAPD's Use of Force procedure and their training. It is also my opinion these actions are acceptable conduct in the law enforcement profession for officers in the same or similar circumstances. In my opinion, any officer in the same or similar circumstances as the defendant officers could have acted in the same or similar manner as the defendant officers in determining the use and level of force was necessary in order to accomplish a legitimate police objective and could have acted in the same or similar manner as Officers Flaig and Sanchez. I make note of the fact the officers were issued a written reprimand for their use of the TASER against Norman. Under the contract between the police union and the COSA, an officer may not appeal a written reprimand. It is my opinion the officers would have prevailed had they had the opportunity to appeal the reprimand because the policy as it was written, was unenforceable. It has since been changed.[139]

Moreover, the medical evidence makes it clear the actions of the Officers did not cause Norman Cooper's death. Defendants have attached to the Appendix to Defendants' Motion for Summary Judgment as Exhibit "J", and incorporated herein as summary judgment evidence, the affidavit of Dr. Robert Bux, a board certified forensic pathologist licensed to practice medicine in the States of Colorado and Texas. Dr. Bux has been licensed to practice in Texas since 1978 and in Colorado since 1982, and has been board certified in Anatomical and Clinical Pathology since June of 1982 and Forensic Pathology since May of 1985. His professional background and the positions he has held as a Forensic Pathologist and medical examiner are set forth in his report and C.V.[140] After reviewing the autopsy report and toxicology report regarding Norman Cooper, Dr. Bux, found,

No blunt trauma was noted to the chest, abdomen or back. No petechiae were found on the conjunctiva of the sclera of the eyes, on the skin, or on the surfaces of the heart and lungs. No internal injuries were found at autopsy. Examination of the heart included a weight of 430 grams (normal adult male heart weight range of 231-385 grams with normal range 95% normal) with the right coronary artery

---

[139] *Id.* at pp. 10-11.
[140] *See* Exhibit "J".

ostia one centimeter above the sinus of valsalva.  The right and left circumflex arteries coronary arteries had minimal atherosclerosis.  However, the left anterior descending coronary artery focally had up to 60% stenosis.  Microscopic examination revealed approximately 60-70% stenosis due to atherosclerosis. Occasional alveoli of the lungs contained proteinaceous material.  Toxicology studies revealed a methamphetamine level of 0.69 mg/L and amphetamine was present but below the level for quantitation, a femoral blood ethanol level of 0.024 g/dl and a vitreous ethanol level of 0.038 gm/dl.[141]

Dr. Bux further reported,

> Methamphetamine is a potent stimulant with a prolonged half life.  There is no antidote that can reverse the effects of intoxication.  Methamphetamine stimulates the sympathetic nervous system both in the central nervous system and peripherally causing high levels of dopamine and norepinehrine.  This results in high blood pressure and increased heart rate (tachycardia). High levels such as in this case can cause euphoria, increased physical activity and wakefulness for long periods of time.  Other common observable effects are confusion, agitation, anxiety, hallucinations, aggressive behavior and paranoia.  Hyperthermia, secondary rhabdomyolysis, irregular heart rhythms, circulatory collapse, coma, convulsions and death can occur.  Deaths have been reported to occur at levels as low as 0.09 mg/l.[142]

Finally, Dr. Bux opined on the cause of Norman Cooper's death, the following,

> In my medical opinion, based on reasonable medical probability, Norman Cooper died as the result of an excited delirium due to methamphetamine intoxication occurring in the setting of a violent struggle with law enforcement personnel.  The abnormal behavior, physical appearance and the appearance of how the clothing was worn support this diagnosis as does the high level of methamphetamine present in the postmortem femoral blood.  The violent struggle occurred over several minutes.  After the application of the handcuffs Norman was still talking and continued struggling until he tired a few minutes later.  Norman was then noted to become suddenly calm but still breathing with a pulse which was followed by a cardiopulmonary arrest also is in keeping with this diagnosis.  In addition, Norman had an enlarged heart and severe blockage of the left anterior descending coronary artery which also may have contributed to his death.  There is no evidence of restraint or positional asphyxia as there are no traumatic contusions or abrasions to the back or other signs of asphyxia found at autopsy. There is no evidence that Norman suffered an immediate cardiopulmonary arrest after the last Taser deployment and for this reason a lethal cardiac arrest seems unlikely to be cause of his cardiac arrest.  In my opinion, the manner of death is

---

[141] Exhibit "J", p. 6.
[142] Id.

homicide.  This manner of death is in accordance with the National Association of Medical Examiner's guidelines that the manner of death is best certified as a homicide due to the death occurring in association with a physical struggle and during attempted restraint by law enforcement.  The certifying of the death as a homicide does not imply wrongdoing or criminal intent.[143]

Dr. Bux's opinions are supported by the autopsy findings of Assistant Bexar County Medical Examiner, Dr. Garrett T. Phillips.  Defendants have attached to the Appendix to Defendants' Motion for Summary Judgment as summary judgment evidence, the autopsy and toxicology reports from the Bexar County Medical Examiner's Office, labeled as Exhibit "L", which are incorporated herein for all purposes as though set forth herein verbatim.  Dr. Garrett reported:

> After a complete autopsy examination, including toxicologic and microscopic analysis, and in consideration of the available investigative information, it is our opinion that Norman Lee Cooper, a 33 year-old male, died as a result of intoxication with methamphetamine complicated by a prolonged struggle. Contributing to death is cardiomyopathy (enlarged heart).[144]

Moreover, there is simply no evidence to support Plaintiffs' claim Norman Cooper died of positional asphyxia.  As pointed out above, Nathan Cooper says Sanchez got off Norman's back within twenty (20) seconds of handcuffing him, and Flaig got off Norman's back before Sanchez did.[145]  Moreover, although Nathan Cooper testified he believed Sanchez was applying pressure to Norman's back as they finished handcuffing him, he cannot say whether it was with Sanchez' knee or elbow, and he cannot say to what part of Norman's back.[146]

Based upon the foregoing, Defendants respectfully submit there is no evidence supporting the Plaintiffs' claim that Norman Cooper died as the result of being tased or from positional

---

[143] *Id*. at pp. 7-8.
[144] Exhibit "L", p. 8.
[145] Exhibit "B", pp. 134-135.
[146] *Id*. at pp. 133-135.

asphyxia.  Defendants respectfully submit they are entitled to summary judgment on Plaintiff's excessive force claim.

## VII.
## <u>FAILURE TO PROVIDE MEDICAL CARE</u>

In their Complaint, Plaintiffs allege "[i]t was plain to see that Norman Cooper was in extremis. Flaig and Sanchez made absolutely no effort to check on Norman Cooper's health or well-being."[147]  Plaintiffs' Complaint goes on to complain about the inaction of other officers who arrived on the scene "[a]pproximately fifteen (15) minutes later" although it is unclear whether Plaintiffs intend to include Flaig and Sanchez in the group with those officers.[148] Regardless, each officer's actions, or alleged subjective deliberate indifference, must be viewed separately.[149]

Pre-trial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment not to have their serious medical needs met with deliberate indifference.[150]  Arrestees are a subset of pretrial detainees.[151]  In order to establish a claim for denial of medical treatment, a plaintiff must plead sufficient facts showing that a defendant acted with deliberate indifference to a serious medical need.[152]  Liability for inaction to provide medical care attaches only when a defendant's failure to act amounts to deliberate indifference to a

---

[147] Docket No. 29, p. 9., ¶ 31.
[148] Docket No. 29, p. 9-10., ¶¶ 32-37.
[149] *See Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir 2007); *Stewart v. Murphy*, 174 F.3d 530, 537, (5th Cir. 1999).
[150] *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001).
[151] *Nerren v. Livingston Police Department*, 86 F.3d 469, 472–73 (5th Cir. 1996).
[152] *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

detainee's constitutional rights.[153]  To establish a "serious medical need," a plaintiff must state facts showing that he was exposed to a substantial risk of serious harm.[154]

In order to show deliberate indifference, a plaintiff must adduce evidence that a defendant "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs."[155]  Additionally, to act with deliberate indifference, a defendant must both *know of* and *disregard* an excessive risk to inmate health or safety.[156]  Thus, a defendant must actually know that the plaintiff "face[s] a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it."[157]

It is clear from the evidence that neither Flaig nor Sanchez were deliberately indifferent to Norman Cooper's medical needs. After Norman became still, Flaig became concerned for Norman's health because he completely stopped fighting.[158] Although Flaig was not sure whether Norman was taking a breather or it was a change in his health, Flaig radioed for EMS to "step it up because he was concerned for Norman's wellbeing."[159] Flaig was concerned for Norman's wellbeing because of the sudden change in his demeanor.[160] Sanchez placed a pillow under Norman's head.[161] Norman was still breathing, and both officers checked his pulse.[162] Norman had a pulse each time it was checked by Flaig and Sanchez, but he was no longer speaking to

---

[153] *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (*en banc*).
[154] *See generally, Farmer v. Brennan*, 511 U.S. 825 (1994).
[155] *Gobert v. Caldwell*, 463 F.3d 339, 346 n. 21 (5th Cir. 2006); *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).
[156] *Farmer*, 511 U.S. at 837.
[157] *Id.* at 837, 839.
[158] Exhibit "G", p. 5.
[159] *Id.*
[160] *Id.*
[161] Exhibit "H", p. 3.
[162] Exhibit "G", p. 4; Exhibit "H", p. 3.

either officer.[163]  After other officers showed up, Flaig and Sanchez left the room.[164]  At the time Officers Flaig and Sanchez left the room, Norman was still breathing.[165]  Flaig did not know Norman had stopped breathing until after EMS showed up.[166]  Sanchez checked Norman's pulse twice after Norman became still, and found a pulse each time.[167]  In short, both Flaig and Norman took steps to monitor Norman's wellbeing, including calling EMS, asking that EMS step it up, monitoring his pulse, turning him on his side to ensure he could breathe easily, and observing that he was breathing.

Defendants respectfully submit there is no evidence Flaig or Sanchez had subjective knowledge of and were deliberately indifferent to a serious medical condition of Norman Cooper. Defendants Flaig and Sanchez respectfully submit they are entitled to summary judgment on Plaintiffs' claim for failure to provide adequate medical care.

## VIII.
## NEGLIGENT AND GROSSLY NEGLIGENT USE OF HANDCUFFS AND TASERS

Plaintiffs have also pled a cause of action for the negligent and grossly negligent use of handcuffs and Tasers.[168]  It is not clear whether the claim is pled against the individual defendants or the City or both.  It does appear to be brought under Section 1983.  Regardless, it is well-settled that negligence is not actionable under Section 1983.[169]

## IX.
## PLAINTIFFS' STATE TORT CLAIMS

---

[163] *Id.*
[164] Exhibit "B", pp. 138-139.
[165] Id.
[166] Exhibit "F", p. 105.
[167] Exhibit "H", p. 4.
[168] Docket No.29, p. 7.
[169] *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670-71(1986).

It is unclear whether Plaintiffs are alleging a cause of action against the individual defendants under the Tort Claims Act.[170]   Section 101.106, Election of Remedies, of the Texas Tort Claims Act provides in pertinent part as follows: . . .

> (f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.[171]

Plaintiffs' suit against Defendants Flaig, Sanchez and Trevino in their individual capacities, is clearly and solely based upon conduct within the general scope of Defendants' employment, and is brought against the City of San Antonio.[172]   Defendants submit Plaintiffs have judicially admitted that Defendants were acting within the general scope of their employment with the City of San Antonio at all times relevant to Plaintiff's complaints.[173] However, even in the absence of Plaintiffs' judicial admission, there is no doubt under the facts of this case that this case falls within the bar of §101.106(f).  Section 101.001(2) of The Texas Tort Claims Act (TTCA) defines an employee as "…a person, including an officer or agent, who is in the paid service of a governmental unit…."[174]   And clearly the City of San Antonio is a governmental unit as defined by the TTCA.  Section 101.001 of the TTCA states in pertinent part,

---

[170] Docket No. 29, p. 12, states "**V. CAUSES OF ACTION UNDER THE TORT CLAIMS ACT…42.** The occurrence described in the petition (sic) is a direct and proximate cause of the negligent, grossly negligent, reckless and/or wanton *conduct of the City of San Antonio* in the following Particulars[.]"(emphasis added).
[171] TEX. CIV. PRAC. & REM. CODE § 101.106(f).
[172] Docket No. 29, pp. 1, 3.
[173] Docket No. 29, p. 10; *See Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ., 579 F.3d 546, 550 (5th Cir. 2009), cert. denied, 130 S. Ct. 1285, 175 L. Ed. 2d 1075 (2010)* (Facts admitted in a pleading are binding judicial admissions.)
[174] TEX. CIV. PRAC. & REM. CODE § 101.001(2).

that "[i]n this chapter: …   (3) "Governmental unit" means: … (B) a political subdivision of this state, including any city…."[175]   The Texas Supreme Court has ruled that Section 101.106(f) of the TTCA provides that a suit against a government employee acting within the general scope of his employment must be dismissed "if it could have been brought under this chapter [that is, under the (TTCA)] against the governmental unit."[176]   The Texas Supreme Court has since clarified that even claims based on intentional torts are subject to the provisions of section 101.106.[177]   That holding was recently affirmed by the Texas Supreme Court in its holding in *Franka,* supra, wherein the Court stated that "…the rule that any tort claim against the government is brought "under" the [TTCA] for purposes of section 101.106, even if the [TTCA] does not waive immunity" is firmly established.[178]   In applying the rule under section 101.106(f) the *Franka* court stated,

> Properly construed, section 101.106(f)'s two conditions are met in almost every negligence suit against a government employee: he acted within the general scope of his employment, and suit could have been brought under the Act — that is, his claim is in tort and not under another statute that independently waives immunity. In such cases, the suit "is considered to be against the employee in the employee's official capacity only", and the plaintiff must promptly dismiss the employee and sue the government instead.[179]

Plaintiffs' State tort claim against Defendants Flaig, Sanchez and Trevino in their individual capacities, for negligence in the use of handcuffs and Tasers is based on conduct within the general scope of Defendants' employment with a governmental unit, and under the Texas Supreme Court rulings of *Mission ISD* and *Franka,* even Plaintiffs' intentional tort claims ". . .

---

[175] TEX. CIV. PRAC. & REM. CODE § 101.001(3)(B).
[176] *Franka v. Velasquez*, No. 07-0131, 332 S.W.3d 367, 54 Tex. Sup. J. 460, 2011 Tex. LEXIS 70 *1 (Tex. Jan. 21, 2011).
[177] *Mission Consolidated Independent School District v. Garcia,* 253 S.W. 3d 653, 658 (Tex. 2008)
[178] *Franka*, 2011 Tex. LEXIS 70 at *6.
[179] *Id.* at *10 (Internal citations omitted).

are assumed to be 'under [the Tort Claims Act]' for purposes of section 101.106." Defendants respectfully submit the Plaintiffs' pendent state tort claims must be considered to be against Defendants in their official capacity only and must be dismissed.[180]

## X.
## VIOLATION OF SAPD POLICIES

Plaintiffs allege Flaig and Sanchez violated SAPD procedure 512.090(10) by tasing a person they knew to be under the influence of drugs.[181]  They further allege Flaig and Sanchez violated SAPD procedure 601.07 A., presumably by failing to use reasonable care and diligence to preserve the lives, health and safety of prisoners.[182]  However, "[u]nder § 1983, the issue is whether Officer[s] [Flaig and Norman] violated the Constitution, not whether he should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983."[183]  Defendants Flaig and Sanchez submit, based upon the arguments above, they did not violate Norman Cooper's constitutional rights, or if they did, they are entitled to qualified immunity under the facts and law of this case.  Defendants therefor request the Court grant summary judgment on Plaintiffs' claim against Flaig and Sanchez for the alleged violations of SAPD procedures 512.090(10) and 601.07 A.

WHEREFORE PREMISES CONSIDERED, Defendants Flaig and Sanchez respectfully request the Court grant their Motion for Summary Judgment and dismiss, with prejudice to the re-

---

[180] *See*, *Franka v. Velasquez*, 332 S.W.3d 367 (Tex. 2011).
[181] Docket No. 29, at p. 8, ¶ 28; p. 12, at ¶ 42(f); p. 30, ¶ 77; p. 31, at ¶ 79, 80; p. 33, at ¶¶ G(1), 87, n. 16; p. 34, at ¶ 88; ¶ 89, at n. 17.
[182] Id., at p. 8, ¶28; at p. 31, ¶ 80., n. 15.
[183] *Stroik v. Ponseti*, 35 F.3d 155, 159, n. 4 (5th Cir., 1994); *See, McKay v. Dallas Indep. Sch. Dist., 2009 U.S. Dist. LEXIS 18721, *13* (N.D. Tex. 2009).

filing of same, all of Plaintiffs' claims against them, and for such other and further relief, both general and special, at law or in equity, to which Defendants may be justly entitled.

Respectfully submitted,

**HOBLIT DARLING RALLS**
**HERNANDEZ & HUDLOW LLP**
6243 I.H. 10 West, Suite 601
San Antonio, Texas 78201
Telephone:    (210) 224-9991; Fax   (210) 226-1544
Email:          mralls@hdr-law.com

By:   _____

**N. MARK RALLS**
State Bar No. 16489200

**ATTORNEYS FOR DEFENDANTS OFFICER**
**OLIVER FLAIG, ARNOLDO SANCHEZ AND**
**ASSISTANT CHIEF ANTHONY TREVINO**


**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2017 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system that will send notification of such filing to the following:

Edward L. Pina
Matthew Neal Gossen
EDWARD L. PINA & ASSOCIATES, P.C.
8118 Datapoint Drive
San Antonio, Texas 78229
*Counsel for Plaintiffs*

_____

**Mark Ralls**